**AMERICAN FEDERATION OF TOBACCO GROWERS, Inc. v. NEAL et al.**

No. 6062.

United States Court of Appeals
Fourth Circuit.

Argued June 19, 1950.

Decided July 29, 1950.

T. Ryland Dodson, Danville, Va., and George E. Allen, Richmond, Va. (Fowler & Dodson, Danville, Va., and Allen, Allen, & Allen, Richmond, Va., on brief), for appellant.

C. Stuart Wheatley, Danville, Va. (Garrett & Wheatley, Danville, Va., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from a summary judgment for defendants in a suit to obtain an injunction and recover damages under the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., and the statute to prevent discrimination against farmers Cooperative Associations, 15 U.S.C.A. §§ 431–433. Plaintiff is the American Federation of Tobacco Growers, a farmers cooperative association, incorporated under the laws of Virginia, trading as Growers Cooperative Warehouse, and owning a tobacco warehouse just outside the corporate limits of Danville, Virginia. The defendants now in the case are the Danville Tobacco Association, an incorporated association which constitutes a tobacco board of trade and as such controls the selling of tobacco on the Danville market, and individual tobacco warehousemen of Danville who are members of the executive committee of the Danville Tobacco Association. A number of tobacco buyers were originally named as defendants, but they were dismissed from the case prior to the summary judgment and relief is no longer asked against them.

Danville, Virginia, is one of the largest markets in the bright tobacco belt. The total sales of tobacco there in the year preceding the institution of this action were around 58,000,000 pounds having a value of approximately $29,000,000. There are a number of tobacco warehouses in the city to which farmers bring their tobacco from the surrounding territory; and in these warehouses it is sold at auction. The Board of Governors of the bright Belt Warehousemen's Association has prescribed rules and regulations governing auction sales throughout the bright tobacco belt; and among these are regulations to the effect that the sales shall be held for only five and one-half hours per day, that the number of baskets of tobacco which may be sold per hour shall not exceed 400 and that not more than 300 pounds of tobacco may be sold in one basket. The bidders at the sales are representatives of the tobacco manufacturing companies and independent buyers or speculators. The presence of a group of buyers representing the principal manufacturing companies is necessary for the holding of a satisfactory auction sale; and, as it is not possible under the regulations for a buyer to bid on more than 2200 baskets per day, it is necessary for each of the companies to have a number of buyers at a large market like Danville. There were buying on that market at the time of the institution of this suit four sets of buyers representing the leading tobacco manufacturing companies of the country.

The market in Danville is controlled by the Danville Tobacco Association, which is a corporation created by the General Assembly of Virginia in the year 1887 "for the purpose of encouraging, promoting and regulating the sales of leaf tobacco and trade therein in the town of Danville". Its membership is composed of tobacco warehousemen who operate warehouses in Danville and tobacco buyers who buy in the Danville market. It is governed by an executive committee of twelve persons, who fix the rates charged by the warehouses, which are uniform, apportion the selling time among the warehouses, pass upon applications for membership in the association and generally control and regulate the Danville market. Of supreme importance to every warehouseman is the allotment of selling time, since the allotment made by the association is respected by the buyers and it is not practical to conduct auction sales except in accordance with the allotment.

Plaintiff, a tobacco farmers cooperative, built a tobacco warehouse in the year 1949, just outside the corporate limits of Danville, at a strategic location on a public highway, just across the Dan River and not more than a quarter of a mile distant from the warehouse of one of the members of the association. Application was made for membership in the association and an allotment of selling time; but both were refused by the executive committee. No reason was given for the refusal except that plaintiff's warehouse was outside the city limits and that the association for that reason could not admit it to membership and had no power to allot selling time to it. It is admitted that, with the four sets of buyers who were operating, sufficient selling time was available to permit an allotment to plaintiff without depriving other warehousemen of the selling time necessary to their operations. Plaintiff attempted to function independently but was unable to do so, since it was impossible to have a set of buyers furnished by the competing tobacco companies to buy in plaintiff's warehouse alone and the farmer customers were not willing to have their tobacco sold at an auction where these companies were not represented. One sale was held on September 12, 1949, where buyers representing two companies were present; but the results were so unsatisfactory that no further sales were attempted. The result of the action of the association in refusing to allot selling time to plaintiff, therefore, was to exclude it completely from the Danville market.

Plaintiff filed suit alleging that the action of the association was violative of the provisions of the Sherman Anti-Trust Act and that, since such action was motivated by the fact that plaintiff was a farmers cooperative association, it was violative, also, of the statute forbidding discrimination against such associations. The facts were developed by depositions; and the District Judge entered summary judgment for defendants on the theory that, although a restraint of trade was shown, it was not an unreasonable restraint in view of the fact that warehousemen within the City of Danville were burdened by higher real estate values and higher building costs than warehousemen outside the city and were subject to certain taxes to which the latter were not subject, and that defendants had done nothing to prevent plaintiff's proceeding independently if it was able to do so. We think that this was erroneous, that an unreasonable restraint of trade was clearly shown and that there was sufficient evidence on the issue as to discrimination against a farmers cooperative, in view of the fact that the reason given by defendants for excluding plaintiff from the market was so unsubstantial as to justify a conclusion that it was a mere pretext.

■ There can be no question but that, by their control of the allotment of selling time, defendants had it within their power to exclude plaintiff from the Danville market or that plaintiff was excluded therefrom and eliminated as a competitor as a result of their exercising the power. The reason given by defendants for their action, i.e. that they were not allowed by their charter to admit to membership warehouses not within the corporate limits of Danville or to exercise any sort of regulation over warehouses beyond those limits, will not stand analysis. The act incor-

porating the tobacco board of trade had reference, of course, not to the corporate limits of Danville but to the tobacco market which was growing up at that place, a market in which tobacco was sold from all the surrounding country. It was to the regulation of this market that the act creating the Board of trade was addressed; and it passes the bounds of all reason that the legislature could have intended that such a board of trade should limit its functions to the corporate limits of the city and discriminate against tobacco warehouses outside those limits, merely because they happened to be outside boundaries which had no relation to the market and which were subject to change from time to time. We note that the learned trial judge did not base his decision upon such reason, but upon the fact that taxes and building costs were higher in the city than outside and that defendants had done nothing to prevent plaintiff operating its warehouse as it might see fit.

We do not think, however, that the reasons given by the judge support the judgment for defendants. To say that a board of trade whose members have monopolistic control of a market may exclude an outsider who wishes to compete therein merely because he has an advantage in taxes or construction costs is to advance a proposition that has no support in any decision with which we are familiar, and none has been cited in support of it. Persons trading in and controlling a market, who have a heavy expense because they operate in an expensive building, would certainly not be justified on that account in excluding from competition a prospective competitor who was not burdened by such an expense; but there would be just as much reason in this as in permitting them to exclude him because his warehouse or factory was not subject to city costs and taxes. A restraint of trade involving the elimination of a competitor is to be deemed reasonable or unreasonable on the basis of matters affecting the trade itself, not on the relative cost of doing business of the persons engaged in competition. One of the great values of competition is that it encourages those who compete to reduce costs and lower prices and thus pass on the saving to the public; and the bane of monopoly is that it perpetuates high costs and uneconomic practice at the expense of the public.

It is argued that defendants do not exert a monopolistic control of the market because plaintiff is at liberty to conduct independent sales in its warehouse notwithstanding their refusal to allot it selling time; but this ignores the realities of the situation. Under the system of market control which defendants have built up, allotment of selling time is a prerequisite to doing business in the market; and, having set up the market in this way, defendants may not be heard to say that they have not established a monopoly merely because they do not interfere with an outside warehouse if it can shift for itself. It was just this sort of manipulation, involving the control of markets and the stifling of competition, that the Sherman Act was intended to prevent. As was well said by Judge Learned Hand in United States v. Associated Press, D.C., 52 F.Supp. 362, 369: "If a combination effectively excludes, or tries to exclude, outsiders from the business altogether, it is a monopoly, or an incipient monopoly, and it is unconditionally unlawful. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. [434]. That is indeed the standard type of an illicit combination."

The Associated Press case, from which we have just quoted and which was affirmed by the Supreme Court, 326 U.S. 1, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013, is directly in point here. That case like this involved voluntary association which resulted in such control of the distribution of news that a newspaper not admitted to membership was greatly handicapped, although there was nothing to prevent its proceeding independently if able to do so. In holding a violation of the statute to have

been shown, the Supreme Court said that "The Sherman Act was specifically intended to prohibit independent businesses from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete." And the Court later used the following significant language: "The restraints on trade in news here were no less than those held to fall within the ban of the Sherman Act with reference to combinations to restrain trade outlets in the sale of titles, Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; or enameled ironware, Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 48-49, 33 S.Ct. 9, 14, 15, 57 L.Ed. 107; or lumber, Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 611, 34 S.Ct. 951, 954, 58 L.Ed. 1490, L.R.A.1915A, 788; or women's clothes, Fashion Originators' Guild v. Federal Trade Commission, supra; or motion pictures, United States v. Crescent Amusement Co., 323 U.S. 173, 65 S. Ct. 254 [89 L.Ed. 160]. Here as in the Fashion Originators' Guild case, supra, 312 U.S. at page 465, 61 S.Ct. at page 707, 85 L.Ed. 949, 'the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus "trenches upon the power of the national legislature and violates the statute." Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 242, 20 S.Ct. 96, 107, 44 L.Ed. 136.'"

As to the contention that the restraint of trade here involved was a reasonable one, it is a sufficient answer that the effect of the action of the defendants was to exclude a competitor from a substantial market in interstate commerce; and it is well settled that such exclusion is unreasonable per se. "The purpose of the anti-trust laws—an intendment to secure equality of opportunity—is thwarted if group-power is utilized to eliminate a competitor who is equipped to compete", William Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738, 743. "Not only is price fixing unreasonable, per se, * * * but also it is unreasonable, per se, to foreclose competitors from any substantial market." International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20; Fashion Originators' Guild v. Federal Trade Comm., 2 Cir., 114 F.2d 80, affirmed 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. "The anti-trust laws are as much violated by the prevention of competition as by its destruction * * *. It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competive advantage, or to destroy a competitor, is unlawful." United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236. See also Fashion Originators Guild v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434.

In the case of United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 259, 89 L.Ed. 160, it appeared that a combination of exhibitors of moving pictures had used its buying power to eliminate competitors. In condemning this as a violation of the anti-trust act the Supreme Court said, "Action by a combination of exhibitors to obtain an agreement with a distributor whereby commerce with a competing exhibitor is suppressed or restrained is a conspiracy in restraint of trade and a conspiracy to monopolize a part of the trade or commerce among the States, each of which is prohibited by the Sherman Act." The same can certainly be said of tobacco warehousemen who use their organization into a board of trade to monopolize the time of the tobacco buyers allotted to the market and thus to exclude another warehouseman from competing on the market with them. No one would question this conclusion, we think, if all the tobacco at Danville were sold in one place and defendants had used their power to prevent the buyers from bidding on plaintiff's tobacco. We do not see that the question is different because the tobacco is sold in different warehouses and

plaintiff's warehouse happens to be outside the city limits.

■ For the reasons stated, we are of opinion that what defendants have done is a violation of the Sherman Act and that plaintiff is entitled to relief under that statute. We think, also, that summary judgment for defendant is not warranted on the claim made under the statute forbidding discrimination against farmers cooperative associations. The fact that the defendants' warehouses charge a uniform commission for their services and that the plan of the cooperatives gives profits derived from operation to members, coupled with the flimsy nature of the reason given by defendants for excluding plaintiff from participation in the tobacco market, is sufficient to raise a substantial question as to whether there was not present in the case the discrimination which the latter statute forbids. Since we are of opinion that the Sherman Act has been violated, however, and all the relief which plaintiff seeks may be obtained under that statute, it will probably not be necessary to deal further with questions arising under the statute forbidding discrimination against farmers cooperatives.

The judgment appealed from will be reversed and the case will be remanded to the court below with direction to grant plaintiff injunctive relief against violation of the statute and determine the issue of damages in accordance with the proper practice applicable in such cases.

Reversed and remanded.