ASHEVILLE TOBACCO BOARD OF TRADE, INC., a corporation, et al., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 7678.

United States Court of Appeals Fourth Circuit.

Argued Nov. 10, 1958.

Decided Jan. 20, 1959.

504

Harold F. Baker, Washington, D. C. (Williams & Williams, Clinton, N. C., R. R. Williams, Asheville, N. C., Howrey & Simon, and Richard L. Perry, Washington, D. C., on the brief), for petitioners.

Malcolm B. Seawell, Atty. Gen. of North Carolina, for the State of North Carolina, amicus curiae.

J. B. Truly, Atty., Federal Trade Commission, Washington, D. C. (Earl W. Kintner, Gen. Counsel, James E. Corkey, Asst. Gen. Counsel, and Henry G. Pons, Atty., Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before SOPER, Circuit Judge, and THOMSEN and BOREMAN, District Judges.

THOMSEN, District Judge.

This petition to review a "cease and desist" order of the Federal Trade Commission raises two principal questions: (1) whether the case is within the jurisdiction of the Commission; and (2) whether there is substantial evidence in the record considered as a whole which supports the finding of the Commission that certain regulations adopted by petitioner Asheville Tobacco Board of Trade, Inc. (Board) unreasonably and unduly restrain trade in the purchase and sale of tobacco on the Asheville market and constitute unfair methods of competition and unfair acts or practices in commerce within the meaning of § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45.

Tobacco, the principal agricultural commodity produced in North Carolina, is sold at auction through the facilities of tobacco warehouses by farmers to manufacturers of tobacco products and to independent buyers for shipment in interstate and foreign commerce. A tobacco market consists of a group of warehouses, which operate under public license. Burley tobacco of the North Carolina type is grown in eight states. There are three Burley tobacco auction markets in North Carolina, of which Asheville is by far the largest, and there are several such markets in eastern Tennessee. In 1954 about 11.5 million pounds of producers' tobacco were sold at Asheville, and in 1955 about 9.2 million pounds.[1]

Various aspects of the production and marketing of tobacco are subject to state or federal regulation. N.C.Gen.Stat. § 106–465 authorizes local tobacco boards of trade to make reasonable rules and regulations for the economical and efficient handling of the sale of leaf tobacco at auction, but does not authorize the control of prices or the making of rules and regulations in restraint of trade. The boards adopt regulations governing the allotment of selling time to the warehouses on the market, and to new warehouses. The need for such allocation is well settled. Rogers v. Douglas Tobacco Board of Trade, 5 Cir., 244 F.2d 471; In the Matter of Wilson Tobacco Board of Trade, F.T.C.Dkt.No.6262, 1956–57, C.C. H.Trade Reg.Rep. paras. 25,808, 26,180.

Petitioner Board is a non-stock corporation organized in 1931. Membership is open to warehousemen and purchasers of leaf tobacco. The twelve auction warehouses in the market are members, entitled to one vote each. Purchasers may hold either participating or non-participating memberships; participating members are entitled to vote, but only warehousemen or their general managers are eligible for membership on the Board of Directors, which is the governing body of the Board.

By common consent the Burley Tobacco Association, a voluntary interstate organization, assigns selling time to the several Burley tobacco markets. The auction season at Asheville begins around December 1 and lasts about six weeks. The major tobacco companies added a second set of buyers to the Asheville market in 1953, making possible two simultaneous auctions. Thereafter the total selling time available was eight hours a day, four hours for each set of buyers. A rotation system is used, each warehouse received its allotted percentage of selling time each day. If a warehouse does not have enough tobacco or

---

1. These figures do not include resales of tobacco purchased at auction by the warehousemen themselves, which amount- ed to more than one million pounds in each of those years.

its floor to consume all of its allotted time, "free time" results and passes on until the sale reaches a warehouse which has enough tobacco on hand to use the free time on that day. A warehouse is said to be "blocked" when it has more tobacco on its floor than can be sold in its allotted time.

In 1953 the Asheville market had eleven warehouses, with a total of 475,182 square feet of floor space; four firms operated all of them. During the 1953 market season and for several years prior thereto, the Board, to the satisfaction of all members, had allotted selling time on the "floor space system", i. e. the percentage of the selling time allotted to each warehouse was in direct proportion to its floor space. However, members of the Board and their attorney had discussed possible amendments to its by-laws, including a change in the method of allotting sales time. They feared a building war like those which had taken place elsewhere under the floor space system. On January 2, 1954, some of the warehouse members entered into a written agreement to govern the allotment of selling time among the warehouses for the 1954 and succeeding seasons, provided no new warehouse was built. They also petitioned the Board to adopt a regulation which would give new warehouses during their first year selling time based on 50% of their floor space, increasing to 75% during the second year, and to 100% in subsequent years. The proposed regulation was adopted, but never went into effect.

On January 14, 1954, C. T. Day, an independent buyer of tobacco, who had been a member of the Board for many years, announced his intention of building a warehouse containing enough floor space to capture 25% of the total available selling time. Petitioner Walker took up Day's challenge, saying that every time Day drove a nail he would drive one too. During 1954 Day did build a new warehouse, which contained 125,000 square feet of floor space. Consequently, on October 2, 1954, the Board adopted new bylaws which (1) discarded the floor space system, (2) adopted a modified "performance system" for the allotment of selling time to existing warehouses, and (3) set up a "unit" system for the allocation of selling time upon the entry of a new warehouse. Under a pure performance system selling time is allotted to each warehouse in direct proportion to producers' sales in such warehouse during the year preceding the allotment. The Board, however, modified the performance system by a "gain or loss proviso": that the selling time allotted to any warehouse shall not vary more than $3\frac{1}{2}\%$ from the selling time allotted to such warehouse for the preceding season. The "new warehouse proviso" adopted by the Board allots to a new warehouse a unit of selling time equal to the average of the selling times of all warehouses on the market, unless the new warehouse is smaller than the average, in which event its allotment is reduced.

After the meeting, the Board of Directors allotted selling time for the 1954 season in accordance with the new by-laws. Since Day's new warehouse raised to twelve the number on the market, it was allotted 8.33% of the selling time, i. e. one-twelfth of the total time available, although it contained 20.83% of the total selling space. The remainder of the time was divided among the other warehouses in accordance with their sales during the 1953 season.

Immediately after the allocation of his 1954 selling time, Day filed suit in the Superior Court of North Carolina for an injunction against enforcement of the new regulations. In November, 1954, that court denied the injunction after conducting a hearing and making findings of fact. Day appealed to the Supreme Court of North Carolina, which affirmed the judgment below, stating that "the rule by which the allotment was made to plaintiff by the Board appears fair and equitable. Indeed, it does not appear that there is any restraint of trade in the rule." Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 144, 87 S.E.2d 18, 24. During the 1954 season, despite the fact that Day's ware-

house was blocked more often and for longer periods than any other warehouse, he succeeded in selling 20.19% of all producers' tobacco sold on the Asheville market. He was able to sell more tobacco than could be sold in his allotted selling time because of free time accruing to him on days when the other warehouses had sold all the tobacco they had on hand before their allotted time expired. The gain or loss proviso, however, limited any possible increase in Day's 1955 allotment to 3½% of the 8.33% allotted to him in 1954, so his allotment for the 1955 season was only 8.64% of the total selling time. Nevertheless, he sold 21.4% of the total tonnage in the 1955 season and over .27% in the 1956 season.

After the decision of the Supreme Court of North Carolina in Day v. Asheville Tobacco Board of Trade, Day lodged a complaint with the Federal Trade Commission. Hearings were held before an examiner. In his initial decision the examiner found that the acts and practices complained of "have had and now have a tendency and capacity to, and do, unreasonably and unduly restrain trade in the Asheville tobacco market in the purchase, sale and distribution of tobacco in commerce, and constitute unfair methods of competition and unfair acts and practices in commerce within the intent and meaning of § 5 of the Federal Trade Commission Act", and issued an order to cease and desist. On appeal the Commission modified one paragraph in that decision, restricting its scope; otherwise, the Commission adopted the hearing examiner's decision.

The Commission's order requires petitioners, in connection with the movement of tobacco in interstate commerce, to cease and desist from "devising, adopting, using, adhering to, maintaining or cooperating in the carrying out of any plan, system, method, policy or practice which: 1. Allots selling time to new entrant warehouses on the Asheville tobacco market on any basis or in any manner which fails to take into account and give reasonable credit for the full size and capacity of a new entrant; 2.

Limits the possible gain or loss in selling time allotted to any warehouse, under the performance system or any other system, for any one selling season to 3½%, or any other specific percentage, of the selling time so allotted to such warehouse for the preceding selling season; or 3. Has the purpose or effect of foreclosing or preventing any new entrant warehouse on the Asheville tobacco market, or any other warehouse doing business on that market, from competing therein on a fair and equal basis."

### Jurisdiction.

█ Petitioners contend that this is a private controversy involving no specific and substantial public interest. Federal Trade Commission v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138; American Airlines, Inc. v. North American Airlines, 351 U.S. 79, 83, 76 S.Ct. 600, 100 L.Ed. 953. However, Congress has declared: "Transactions in tobacco involving the sale thereof at auction as commonly conducted at auction markets are affected with a public interest * * *." Tobacco Inspection Act of 1935, 7 U.S.C.A. § 511a. This court has held that there is a substantial public interest in maintaining free and open competition among warehousemen on tobacco auction markets. American Federation of Tobacco Growers, Inc. v. Neal, 4 Cir., 183 F.2d 869. See also Rogers v. Douglas Tobacco Board of Trade, 5 Cir., 244 F.2d 471. The Supreme Court noted in Klesner that the public interest often is specific and substantial because the unfair method employed threatens the existence of present or potential competition. 280 U.S. at page 28, 50 S.Ct. at page 4. That is the basis for the jurisdiction of the Commission in this case.

█ Petitioners further contend that the adoption of regulations governing "the internal allocation of selling time" to the several warehouses is not in interstate commerce. The Commission has no jurisdiction to proscribe unfair methods of competition that merely affect interstate commerce; they must be in such commerce. Federal Trade Commission v. Bunte Bros., 312 U.S. 349, 61

S.Ct. 580, 85 L.Ed. 881; cf. Chamber of Commerce of Minneapolis v. F. T. C., 8 Cir., 13 F.2d 673, 684. Tobacco auctions are an integral and indispensable part of interstate commerce in tobacco. Currin v. Wallace, 306 U.S. 1, 10, 59 S.Ct. 379, 83 L.Ed. 441, affirming Wallace v. Currin, 4 Cir., 95 F.2d 856, 859, 863. The practices of the Board and its members at issue in this case are an essential part of such commerce. American Federation of Tobacco Growers, Inc. v. Neal, 4 Cir., 183 F.2d 869.

Petitioners' final argument on jurisdiction is that the Board is an administrative agency of the State of North Carolina, exercising powers delegated to it by the legislature, and is therefore beyond the jurisdiction of the Commission.

In Parker v. Brown, 317 U.S. 341, 350, 63 S.Ct. 307, 313, 87 L.Ed. 315, the Supreme Court held that it is not the purpose of the antitrust laws to restrain "a state or its officers or agents from activities directed by its legislature". On the other hand, "a state does not give immunity to those who violate the Sherman Act [15 U.S.C.A. §§ 1–7, 15 note] by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at pages 350, 351, 63 S.Ct. at page 313, 314. See also Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035. The question, therefore, is whether the activities of tobacco boards of trade, particularly the adoption and enforcement of the regulations involved in this case, constitute activities of state officers and agents within the rule of Parker v. Brown.

North Carolina Gen.Stat. § 106–465 authorizes tobacco warehousemen and purchasers to organize local tobacco boards of trade either as non-stock member corporations or as voluntary unincorporated associations, and "to make reasonable rules and regulations for the economical and efficient handling of the sale of leaf tobacco at auction on the warehouse floors in the several towns and cities in North Carolina in which an auction market is situated". The statute also provides: "Nothing in this section shall authorize the organization of any association having for its purpose the control of prices or the making of rules and regulations in restraint of trade."

In Kinston Tobacco Board of Trade, Inc. v. Liggett & Myers Tobacco Co., 235 N.C. 737, 71 S.E.2d 21, and Cooperative Warehouse v. Lumberton Tobacco Board of Trade, 242 N.C. 123, 87 S.E.2d 25, the court referred to the boards as "administrative commissions". In determining the scope of the Federal Trade Commission Act, however, this court is not bound by the State court's characterization of the boards. The interpretation of a federal statute is peculiarly the function of the federal courts.

"It is familiar doctrine that the prohibition of a federal statute may not be set at naught, or its benefits denied, by state statutes or state common law rules. In such a case our decision is not controlled by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. There we followed state law because it was the law to be applied in the federal courts. But the doctrine of that case is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law. * * When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield. * * *" Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, at page 176, 63 S.Ct. 172, at page 173, 87 L.Ed. 165.

See also Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 162, 67 S.Ct. 237, 91 L.Ed. 162; Lyeth v. Hoey, 305 U.S. 188, 194, 59 S.Ct. 155, 83 L.Ed. 119; Lohman v. Commissioner, 8 Cir., 133 F.2d 977, 983; Stuart v. Kleck, 9 Cir., 129 F.2d 400, 403; cf. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447; Rice v. Board of Trade of City of Chicago, 331 U.S. 247, 67 S.Ct. 1160, 91 L.Ed. 1468.

Parker v. Brown suggests the standards which federal courts should apply in determining what is state action. In that case the Supreme Court was considering a program set up by state officials, under the provisions of a California statute, to control the production of raisins and to prevent unlimited competition therein. Upholding the program against a claim that it violated the Sherman Act, the court said:

> " * * * It is the state which has created the machinery for establishing the prorate program. Although the organization of a prorate zone is proposed by producers, and a prorate program, approved by the Commission, must also be approved by referendum of producers, it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy. The prerequisite approval of the program upon referendum by a prescribed number of producers is not the imposition by them of their will upon the minority by force of agreement or combination which the Sherman Act prohibits. The state itself exercises its legislative authority in making the regulation and in prescribing the conditions of its application." 317 U.S. at page 352, 63 S.Ct. at page 314.

The teaching of Parker v. Brown is that the antitrust laws are directed against individual and not state action. When a state has a public policy against free competition in an industry impor-tant to it, the state may regulate that industry in order to control or, in a proper case, to eliminate competition therein. It may even permit persons subject to such control to participate in the regulation, provided their activities are adequately supervised by independent state officials. Rice v. Chicago Board of Trade, 331 U.S. 247, 253, note 4, 67 S.Ct. 1160, 91 L.Ed. 1468; United States v. S. E. Underwriters Association, 322 U.S. 533, 562, 64 S.Ct. 1162, 88 L.Ed. 1440; Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035. See also note in 95 Pa.L.Rev. 223, 229. But such action must be state action, not individual action masquerading as state action. A state can neither authorize individuals to perform acts which violate the antitrust laws nor declare that such action is lawful.

Before § 106–465 was passed, tobacco boards of trade existed at common law in North Carolina by common consent or by contract and exercised the power to make regulations governing auction sales of tobacco. Gray v. Central Warehouse Co., 181 N.C. 166, 106 S.E. 657; Cooperative Warehouse v. Lumberton Tobacco Board of Trade, 242 N.C. at pages 132, 133, 87 S.E.2d at pages 30, 31. It was recognized that the business was affected with a public interest and that those engaged in the business were obliged to operate in a way that was reasonable and beneficial to the trade.

The decisions of the North Carolina courts since the enactment of § 106–465 make it clear that the sale of tobacco at auction is of great public importance to the State of North Carolina, but they also show that the operation of the business is in the hands of private parties. A tobacco board of trade is organized primarily for the benefit of those engaged in the business; its articles of association and bylaws constitute a contract amongst the members by which each member consents to reasonable regulations pertaining to the conduct of the business. Bright Belt Warehouse Ass'n v. Tobacco Planters Warehouse, 231 N.C. 142, 56 S.E.2d 391; Cooperative Ware-

house v. Lumberton Tobacco Board of Trade, supra.

As the Federal Trade Commission noted: "The State bears no part of the expense of operating boards of trade. The officers and directors of the Asheville Board, and of other boards, are neither elected by the people nor appointed by State authority; they are businessmen who own and operate warehouses on the tobacco market. They are not accountable to the State, and are not supervised in any manner by State officials." The State officials did not require compliance with a North Carolina statute which directs each State agency to file with the Secretary of State all rules and regulations adopted by the agency for the performance of its functions. Action by the State has been confined to (1) the statutory requirement that the regulations adopted by the boards be just and reasonable and not in restraint of trade, and (2) decisions of the courts upon controversies arising between members.

■ The regulations and activities of petitioners which are being considered in this case were not state action, but were individual activities subject to the jurisdiction of the Federal Trade Commission. °

### Restraint of Trade.

The decision of the Commission did not condemn the use of a performance system for the allotment of selling time.[2] The Commission objected to the modification of the performance system by the $3\frac{1}{2}\%$ "gain or loss proviso", and to the "new warehouse" provision. It held that "the new warehouse proviso and the gain or loss proviso, both separately and operating in conjunction with each other, are unreasonable and unfair and constitute an undue hinderance to and restriction upon fair competition in the Asheville tobacco market."

With respect to the gain or loss provision the Commission said: " * * * The record demonstrates that, through its operation, established warehouses could not lose more than $3\frac{1}{2}\%$ of their selling time in any given season by reason of marketing difficulties encountered during the preceding season and, also by reason of the proviso, that neither a new entrant nor any established warehouse could gain more than $3\frac{1}{2}\%$ in any one season. Clearly, under this proviso, existing warehouses gained an unreasonable and unfair competitive advantage, since if a new entry, notwithstanding the fact that its allocated time was limited under the 'new warehouse proviso', still managed to compete by improving or changing service, the established warehouses remained secure in the knowledge that any newcomer would be limited arbitrarily to an increase in selling time each year to $3\frac{1}{2}\%$. As illustrative of this result, it appears that the new warehouse previously mentioned as having been granted 8.33% of available selling time in 1954 would have to wait about 28 years to be allocated the approximately 21% of selling time which it would have obtained under regulations in effect when it was constructed." The Commission ordered petitioners to cease and desist from using any plan which "limits the possible gain or loss in selling time allotted to any warehouse, under the performance system or any other system, for any one selling season to $3\frac{1}{2}\%$, or any other specific percentage, of the selling time so allotted to such warehouse for the preceding selling season."

■ The condemnation of the $3\frac{1}{2}\%$ limit is clearly justified. Rogers v. Douglas Tobacco Board of Trade, 5 Cir., 244 F.2d at page 842. This feature does not seem to have been considered by the Supreme Court of North Carolina in Day v. Asheville Tobacco Board of Trade.

2. F.T.C.Dkt. No. 6490, —— CCH Trade Reg.Rep., para. ——. The legality of the performance method of allocating selling time had previously been sustained by the Commission, Matter of Wilson Tobacco Board of Trade, F.T.C.Dkt. No. 6262, 1956, 57 CCH Trade Reg.Rep., paras.

25,808, 26,180, by the Supreme Court of North Carolina in Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 87 S.E.2d 18, and by the Fifth Circuit in Rogers v. Douglas Tobacco Board of Trade, 244 F.2d at page 480.

There are, however, a number of reasons why it may be desirable that there be some limit on the possible gain or loss to an individual warehouse in a single year. Loss or damage to a warehouse by fire or other casualty, illness of the warehouseman, or other fortuitous circumstances, may cause an abnormal reduction in the business of a warehouse in a particular year, which should not be perpetuated by a performance rule without some limiting proviso. Again, a warehouseman with large financial resources might attempt to monopolize the market through advertising campaigns, bidding in farmers' tobacco at prices above those which his competitors can afford, and other methods, which could be used for several years until his selling time is abnormally increased, and his competitors of more limited means are driven from the market, even though they have rendered adequate service and have helped to build up the market over the years. A reasonable limitation on the percentage of gain or loss in any one year would not violate the antitrust laws. The order of the Commission does not prevent a reasonable limitation based upon a percentage of the total selling time rather than on the selling time allotted to the particular warehouse for the preceding season.

■ The Commission condemned the "new warehouse" provision separately and in connection with the $3\frac{1}{2}\%$ "gain or loss proviso", although that very provision had been approved by the Supreme Court of North Carolina in Day v. Asheville Tobacco Board of Trade, and a similar new warehouse provision had been approved by the Fifth Circuit in Rogers v. Douglas Tobacco Board of Trade. The evidence clearly supports the condemnation of the new warehouse provision in connection with the $3\frac{1}{2}\%$ gain or loss proviso. But it is not so clear that the new warehouse provision itself, or combined with a reasonable gain or loss provision, would unduly tend to restrain trade or constitute an unfair practice or an unfair method of competition.

■ The Commission does not disapprove of the adoption of a performance system, as opposed to a floor space system or other method of allocating selling time. When a performance system is used, it is necessary to adopt some sort of new warehouse provision, and arguments suggest themselves for and against any type of new warehouse provision which might be adopted. On the one hand, the prevention of overbuilding and building wars is a legitimate objective; on the other hand, the owners of existing warehouses should not be allowed to prevent the construction of desirable new facilities. The controlling principles, as stated by the Supreme Court in Federal Communications Commission v. R. C. A. Communications, Inc., 346 U.S. 86, 91, 92, 73 S.Ct. 998, 97 L.Ed. 1470, and in the concurring opinion of Mr. Justice Frankfurter in Associated Press v. United States, 326 U.S. 1, 27, 65 S.Ct. 1416, 89 L.Ed. 2013, were quoted and applied by the Fifth Circuit in Rogers v. Douglas Tobacco Board of Trade, 244 F.2d at page 479. Competition is not an absolute. Every restraint of trade is not a violation of the antitrust laws; the decisive question is whether it is an unreasonable restraint, and this depends on the significance of the restraint in relation to the particular market under investigation.

The new warehouse provision adopted by the Board as part of its performance system tends to discourage overbuilding by limiting the amount of selling time which a new warehouse may receive in its first year. But combined with a reasonable gain or loss proviso, or with no limit at all on gains or losses, it need not unduly discourage necessary or desirable building operations; it need not prevent a new warehouse from obtaining a fair share of selling time after the first year, nor, indeed, a fair share of the business during the first year through the use of free time (defined above). Day's experience supports this conclusion; he promptly obtained a share of the business greater than his proportion of the total floor space, even though he was hampered by an unreasonable gain or loss proviso.

■ The Commission noted that the extra time which Day recêived during the first and subsequent years was the result of free time; they quoted with approval the statement of the hearing examiner that "[F]or any business to be forced by regulation to depend competitively upon such a fortuitous circumstance is clearly unfair". But it must be remembered that under the performance method, which the Commission has approved, the utilization of free time *is* the way in which a warehouse normally obtains a larger share of the business. The limitation which the national marketing quota imposes on the amount of tobacco produced in any market area, the competition between neighboring markets, and other factors, ordinarily result in free time which may be used by other warehousemen, adding flexibility to the system. The use of such free time by a warehouse in one year increases the allotment of selling time to that warehouse in the following year. Free time will ordinarily furnish reasonable opportunity for expansion under a performance system, so that the public, i. e. the farmers are not hurt.[3] Free time may not permit the builder of a new warehouse to expand as fast as he would like, but his personal complaint, like the complaint of Day against the Board, decided by the North Carolina courts, does not justify condemnation of the regulations unless they tend to discourage unduly the construction of new facilities which may be needed on the market. In considering the reasonableness of such restraint, the other side of the coin must also be considered—the evil of overbuilding and building wars. Unless the facilities on the market are inadequate in quantity or quality, the addition of new facilities may do more harm than good.

The Commission cited certain testimony to show that the new warehouse provision had a deleterious effect on farmers and on the Asheville tobacco market, namely, that some farmers' tobacco had to remain on the floor of the new warehouse for periods from three days to four weeks before selling time became available, and that because of this situation a few farmers took their tobacco to other markets. This testimony, however, is explained by uncontradicted evidence of the ordinary course of business on the Asheville market: of the custom of many farmers to bring their tobacco to the market before it opened, as a result of which the entire market was blocked for twelve days; of the custom of many farmers in the Asheville area to sell their tobacco in Tennessee; and of the efforts of the Tennessee warehousemen to obtain such business by giving such farmers preferred selling time and, in some cases, paying all or part of the additional hauling charges. A few farmers complained because they could not be assured when their tobacco would be sold in Asheville; but if the warehouses in Asheville or anywhere else already contain more tobacco than can be sold in one day or one week because of the custom of the farmers to bring in their tobacco before the auction season opens, then giving preference to one farmer necessarily results in delaying the sale of the tobacco of another farmer, since the hours of sale are fixed by the Burley Tobacco Association.

■ The State of North Carolina is vitally interested in the protection of its tobacco markets. The Supreme Court of North Carolina considered the new warehouse provision at issue in this case and held it fair and equitable and not in restraint of trade. Day v. Asheville Tobacco Board of Trade, 242 N.C. at page 144, 87 S.E.2d at page 24. Although the reasons for that statement are not set out in that opinion, and the decision is not binding on the Commission or on this court, it is a factor which should be considered in determining the reasonableness of the new warehouse provision.

The meaning of the first paragraph of the Commission's order is not entirely

---

3. Unless more tobacco is offered for sale on the market than can be conveniently sold in the time allotted to the market by the Burley Tobacco Association, in which event no system will work satisfactorily.

clear. It requires the Asheville Tobacco Board of Trade to cease and desist from adopting any plan or system which "allots selling time to new entrant warehouses on the Asheville tobacco market on any basis or in any manner which fails to take into account, and give reasonable credit for, the full size and capacity of a new entrant." We are not certain whether this means that the Board shall give credit for the *full* size and capacity of a new warehouse or simply take such size and capacity *into account* and adopt a rule which gives reasonable weight to this factor. In order to correct this ambiguity, and in order that the Commission may give further consideration to the questions which have arisen in this case and are discussed in this opinion, the case is remanded to the Commission for further proceedings.

Remanded.