The DANVILLE TOBACCO ASSOCIA-
TION, a corporation, et al., Appellees,

v.

BRYANT-BUCKNER ASSOCIATES,
INC., Appellant.

The DANVILLE TOBACCO ASSOCIA-
TION, a corporation, et al., Appellees,

v.

PRODUCERS TOBACCO COMPANY, In-
corporated, Appellant.

No. 9136.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 14, 1964.

Decided May 14, 1964.

Frederick Bernays Wiener, Washing-
ton, D. C., (I. Murchison Biggs, Lumber-
ton, N. C., Robert F. Ward, Chatham,
Va., on the brief) for appellant Bryant-
Buckner Associates, Inc.

G. Kenneth Miller, Richmond, Va., (Earle Garrett and Allan Garrett, Danville, Va., on the brief) for appellant Producers Tobacco Co., Inc.

Edwin B. Meade, Danville, Va., (Meade, Tate & Meade, Danville, Va., on the brief) for appellees.

John W. Carter and C. Stuart Wheatley, Danville, Va., (Talbott, Wheatley & Talbott, and Carter & Carter, Danville, Va., on the brief) for W. Townes Lea and Louis W. Love, Partners Trading as Piedmont Warehouse and Hughes Warehouse, and Neal's Warehouses, Inc.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Bright leaf tobacco sales at public auction are conducted in the Danville, Virginia marketing area in warehouses operated by members of the Danville Tobacco Association (Association) which brought this action in the District Court seeking a declaratory judgment upon the validity, apposed the Federal antitrust statutes, of its plan for allotting selling time during the 1962 season among the warehousemen. The defendants were members of the Association. The plan was stricken down as illegal on the opposition of two of the defendants, but this appeal is prosecuted by them to further decrees declaring valid a temporary assignment plan for 1962 and 1963 and a permanent plan for subsequent seasons.

Appellant Bryant-Buckner Associates, Inc. (B–B) contends that these determinations were irregularly reached, that the plans were violative of the antitrust laws in that they permitted an unreasonable restraint of trade, and that the District Court exceeded its authority by ruling upon the general fairness of the plans in advance of their enforcement. Producers Tobacco Co., Inc. (Producers) appeals on the ground that the plans do not provide adequate protection against improper tactics of members and do not give a member credit for past performance.

We affirm the District Court insofar as it concluded that the temporary 1962–1963 plan did not embrace any breach of the antitrust statutes. We suspend provisionally the order establishing the permanent plan, and remand the action with directions to the District Court to seek the advice of the Federal Trade Commission upon the validity and administration of the permanent plan. While procedures in the District Court departed from the conventional course, no injustice resulted. However, except upon the antitrust phase, we think the District Court should not have ruled on the plans prior to their application. Nevertheless, as the plans for 1962 and 1963 have been executed without contravening the antitrust laws, we have no occasion to review their general fairness.

The production and sale of tobacco since colonial times has been impressed with a public interest and subject to governmental control. Hening's Statutes at Large, A Collection of all the Laws of Virginia, Vol. IV, Chap. VII, p. 91 (1720) and Vol. IX, Chap. X, p. 482 (1778); 1951–52 Virginia Cavalcade, Vol. 1, No. 1, p. 39, *Some Called It Treason* by William H. Gaines, Jr. (Virginia tobacco planters in spring of 1682 rebelled in an effort to gain crop control). Moreover, the nature of flue cured bright tobacco, together with other economic factors, has also made it imperative that sales be regulated.[*] Tobacco in Southeast United States is grown in geographical belts. It ripens first in the southernmost of them and, of course, each year's marketing commences there. This process progresses northwardly by seasons until the fifth and last belt, including Virginia, is reached in September.

---

[*] For more instructive accounts of the preparation and sale of Tobacco, see American Federation of Tobacco Growers v. Neal, 183 F.2d 869 (4 Cir. 1950); Rogers v. Douglas Tobacco Board of Trade, Inc., 244 F.2d 471, 473 n. 3 (5 Cir. 1957), 266 F.2d 636, cert. denied, 361 U.S. 833, 80 S.Ct. 85, 4 L.Ed.2d 75 (1959); and report of the master in the present case.

As the growers bring their tobacco to warehouses for sale, the warehousemen have found it wise to prescribe uniform rules for governance of the sales. To this end, they founded an organization known as the Bright Belt Warehouse Association. It does not prescribe local rules for any market but deals solely with general directions relating to the ascertainment of the harvest periods for each belt, the hours of sale, the number of buyers and the quantity of tobacco to be sold daily. The propriety and legality of these regulations are not in dispute, the character of the business admittedly necessitating them.

The Bright Belt Warehouse Association has declared that no more than 400 baskets of tobacco should be sold per hour and that daily sales be confined to 5½ hours. These limitations are compelled by the inability of a buyer to bid intelligently upon a greater quantity or for a longer period. Thus for one day the sales would be restricted to 2200 baskets (400 x 5½). Four buyers, assigned to the Danville market by each major tobacco company, permit four auction sales to be conducted contemporaneously, so that a maximum of 8800 baskets (4 x 2200) can be sold daily.

With the supply of tobacco about constant and sales hours and buyers defined, the question arises how each day's selling time shall be prorated among the warehouses. This problem germinates from the obligation to avoid loss to the producers through failure to sell all the tobacco they have brought to the market on a given day. When auctioned the tobacco has been cured, dried and moistened. Once taken from the pack house for sale, it will easily crumble and spoil unless soon redried. Obviously, no more should be offered than can be cried off within the stipulated period.

For some years previous to 1962 the selling time permissible at Danville had been divided among the warehousemen on the basis of the ratio of the floor space of their respective houses to the total market floor space. This system had serious defects, but none more menacing than the increase of floor space not to meet a need but to enlarge a warehouse's proportion of selling time. Continued uneconomic overbuilding as well as the general advantage of cooperation among the warehousemen, farmers and buyers brought about the action of The Danville Tobacco Association, plaintiff-appellee.

The General Assembly of Virginia chartered the Association by a special act on March 8, 1888, as a non-stock, non-profit corporation, its membership to consist of warehousemen, buyers and rehandlers of leaf tobacco. It was created "for the purpose of encouraging, promoting and regulating the sale of leaf tobacco and trade therein in the town of Danville, Virginia, so far as the same may be done under and in accordance with the laws of this commonwealth." The corporation was authorized "to make all necessary rules and by-laws as a majority of its members may deem proper for the promotion of its objects and the purposes of its incorporation."

In early February 1962, B–B joined the Association. Its warehouse, together with a new one constructed by an existing member, raised the total to 17 on the Danville market. Newspapers had announced that B–B would request an apportionment of time on the basis of approximately 165,000 sq. ft. At the next annual meeting of the Association, February 20, 1962, after a discussion on the disruption of allocations by additional warehouses, the gathering was adjourned until March 12, 1962. The governing board was directed in the interim to "consider a plan for an equitable method of allotting selling time on this market, designed to avert the building of excess floor space presently or in the future."

At the adjourned meeting a proposal for a floor space allocation was offered and adopted; only B–B and another dissented. The new resolution so far as pertinent recited and provided as follows:

"WHEREAS, the existing warehouse space in Danville is eight times that needed to sell the average

crop on this market and it is deemed essential at this time that some fair and reasonable means be followed which will reasonably regulate the construction of additional excess warehouse space by member owners of warehousemen and those who may build new warehouses and who may apply for membership in the Association and an allotment of selling times on the Danville market;

\*    \*    \*    \*    \*    \*

"Now, Therefore, Be It Resolved \*  \*  \* as follows:

### ARTICLE I

"(a) For the selling season of 1962 each owner or operator of a warehouse on the Danville market shall be allotted the same selling time or basket space allotted to his warehouse during the 1961 selling season, subject to such adjustment as may be required under Article II hereof. This basis of selling time shall continue in the future as the owners or operators of warehouses during the selling season of 1962, subject only to adjustments required aforesaid.

\*    \*    \*    \*    \*    \*

### ARTICLE II

\*    \*    \*    \*    \*    \*

"(b) A *new warehouse member of the Association who has constructed a new warehouse* and *an old warehouse member who has constructed a new warehouse* or a new addition to an existing warehouse shall be considered alike in the allotment of selling time or basket space to such new construction.

\*    \*    \*    \*    \*    \*

"(c) Said *new warehouse member* or said old warehouse member who shall apply for an allotment of selling time or basket space for his new construction shall receive that *fractional part of the over-all selling time* on the Danville market *as the square footage of such new construction may bear to the total square footage* of all warehouse floor space includ-

ing such new construction on the Danville market, *but only forty (40%) per cent of such new allotment may be used by the owner or operator of such new construction during the first season of said allotment.* Thereafter said owner or operator of new construction shall be allowed for *each successive selling season an additional fifteen (15%) per cent of his allotted time during each successive selling season for a total of four (4) seasons,* and thereafter the full allotment made to him prior to his first selling season will continue, subject to such adjustments as may be required to allow selling time to owners or operators of subsequent new construction on the Danville market." (Accent added.)

All of the old concerns, except the one which had added a new warehouse, sought selling time on the basis of their 1961 shares. B–B filed a written application for 420,000 sq. ft., more than one-third of the existing market floor space. Acknowledging its original request was for only 165,000, B–B explained the expansion was attributable to the 40% reduction for new construction made by the recent regulation. It also informed the Association of its intention to litigate the validity of the limitation. B–B later enlarged the application to 500,000 sq. ft., posting a cashier's check of $10,000.00 by way of a performance bond.

On the day the Association adopted the resolution it filed the complaint in this case. B–B answered seeking a counter declaration to the effect that the new regulation violated the antitrust laws. Appellant Producers lodged an answer, counterclaim and crossclaim, denying the reasonableness of the regulation, asserting that any apportionment based on floor space was unjust, and praying the Court to promulgate a plan for the Association which would be a fair division of selling time. At the trial in May 1962, the Court gave every party an opportunity to be heard on the validity of the resolution and upon the general question

of what would constitute a lawful program for sharing the selling time.

On June 16, 1962 the Court handed down its findings of fact, conclusions and order. It declared the resolution of the Association adopted in its March 12, 1962 meeting "not in accordance with the law and * * * unfair and unreasonable". However, the motion of B–B for the Court to proceed no further than the declaration of the resolution's invalidity—that it completely fulfilled the purpose of the suit—was denied. Instead, the Court outlined an acceptable plan for 1962.

The order portioned out the selling time by this formula: the entire warehouse floor space of the 1961 Danville market, comprising 1,400,450 sq. ft., was divided by the number of warehouses, then 16, reaching an average size of 87,-527 sq. ft. This became the unit of space. With the addition of 140,000 sq. ft. added by the old member and 268,792 asked by B–B the total became 1,809,242. Division of this new total by the unit of 87,527 gave approximately 21 units. This meant that each unit carried with it 419 baskets (8800 divided by 21).

Following substantially a schedule proposed by appellant Producers, a new entrant was awarded credit in full (419 baskets) for the first unit, 50% thereof for the second unit, and 25% for the third unit. B–B had contended it was bound by a construction contract to build a warehouse of 268,792 sq. ft. Later this claim was reduced to 165,000, the Court believing that area adequate in view of the fact that 400,000 sq. ft. had been quoted as sufficient to accommodate the entire market sales. This was done with the consent of B–B. However, in applying the formula the larger floorage was used.

With 268,792 sq. ft., B–B was allowed a full credit or 419 baskets on the first unit of 87,527 sq. ft., 210 on the second, and 105 on the third, an aggregate of 734. Slight adjustments resulted in a final figure of 724. After deduction of this number and the disallowance of an additional quota asked by the old member on the basis of its new construction, the remainder of the basket-maximum was distributed on the floor space percentages of 1961.

The order of June 16 also called a meeting of the Association on June 27, 1962 "for the purpose of considering and acting on the allotment of selling time made in this decree". On that occasion the quotients projected by the order were adopted by the Association as its own for 1962.

Meanwhile, on May 12, 1962, the Court appointed a master "to report to the court upon findings of fact and conclusion as to the issues presented herein, and particularly a formula for the allotment of selling time for the tobacco warehouses in the Danville area for 1963 and succeeding years." This order was passed with "all parties represented by counsel agreeing thereto". It was understood that the master would not consider a project for 1962. No evidence was taken by him; indeed, no evidence was received by the Court after the decree of June 16, 1962. In consequence, the master was left to draw his report from the proceedings culminating in the June decree, all of which he attended.

After discussing the modus operandi of tobacco marketing and the operations at Danville, in late 1962 the master recommended for 1963 and subsequent years the well-known and approved experience or performance plan with modifications. Asheville Tobacco Board of Trade, Inc. v. F. T. C., 263 F.2d 502, 506 (4 Cir. 1959); Rogers v. Douglas Tobacco Board of Trade, Inc., 244 F.2d 471, 478 (5 Cir. 1957). This, too, had been sponsored by appellant Producers. Under the modified version of this theory the grant of selling time is gauged for each year upon the ratio of the respective sales of the warehousemen in the preceding year to the total sales, with a proviso that a change in selling time of a warehouse will not vary beyond a certain percentage of its selling time in the preceding year. Some reduction is introduced in giving time to a new warehouseman.

By a supplemental report the master advised that application of the experience system be delayed until the 1964 season. His reason was that, as the warehousemen had not known in 1962 that their performance would bear upon the 1963 distribution, the use of the 1962 experience would not be a fair foundation for the 1963 distribution. He thought it would be fairer to look to the 1963 experience for the first measurement. Accordingly, he suggested that the temporary plan of 1962 be carried into 1963.

The report as supplemented was confirmed by the Court on January 30, 1963. A meeting of the Association was called by the order to consider the permanent plan approved by the Court for 1964 and the following years. Adoption of it as the Association's was voted. In turn the Court on March 16, 1963 ratified the action of the Association.

I. The decree of June 16, 1962 answered the primary prayer of the complaint, that is for an adjudication upon the validity of the Association's resolution of March 12, 1962 which cut the share of newcomers to 40% of average space for the first year. It found the resolution unreasonable and unfair, and thus incompatible with antitrust proscriptions. No exception or appeal was taken to that portion of the order.

█ The Association had refrained from enforcing the resolution until its legality was adjudicated. Hence it never became a restraint upon trade. Actually, it was no more than the publication of a by-law passed subject to review by the Court. We hold the adoption of the resolution was not a breach of the antitrust enactments.

█ II. Doubtlessly, the "such other further and general relief prayer" of the complaint warranted the District Court in retaining the cause, to plan for the 1962 season, at the instance of the Association and its members, although B–B later withdrew assent. We do not disapprove the denial of B–B's motion to terminate the suit immediately upon annulment of the resolution of March 12, 1962. No matter how circuitously, in the end the Association did adopt and submit the 1962 plan to the Court. The inquiry of the Court, nevertheless, should more advisedly have been limited exclusively to the issue of whether the plan transgressed the Federal acts.

To begin with, that was the aim of the suit. Moreover, the District Court was not equipped to formulate or adjust a future conception of this sort. It could not readily project a general scheme and direct its operation; it is geared to make adjudications on points as they arise from a practiced design. Instantly, the 1962–1963 and permanent plans were matters essentially within the internal economy of the Association. They should have been written or erected initially under its own procedures with guidance, if need be, from an appropriate and expert administrative agency. At best, after determining ex facie the legality of a submitted method, the Court ought only to retain jurisdiction for solution of such antitrust or related, germane and pendent questions as might arise in its implementation.

Nor do we have facilities for framing a selling time system, or for determining whether it is generally equitable or how it should be reformed to make it fair. However, as the 1962–1963 plan has already been acted upon, no order at this time could rescind or otherwise affect those acts. We can only express a judgment upon the right or wrong of the District Judge's decision on the legal theme of the petition: whether the 1962–1963 plan as drawn and effectuated was free of antitrust taint. We do not hold he was wrong.

The facts we have chronicled comprise the findings of the District Judge together with such other facts as are relevant and uncontroverted. Indeed there is little factual conflict. B–B's allotment of 724 baskets is not without support. Dividends of selling time in a tobacco market, it is conceded, cannot be set apart with precision.

B–B attacks the fairness of its allotment in comparison with the share of baskets it would have received under the floor space plan prevailing in early 1962 when it joined the Association. In this it avers that the total floor space in consideration was then about 1,705,000; B–B's claim for 165,000 was approximately 9.6758% of the whole; and the same percentage of the maximum 8800 baskets is 851. In getting 724 instead of 851, B–B complains it is reduced to 85% of its entitlement under the pre-March 1962 rules.

■ A reduction of 127 baskets, (851 less 724) or 14.93%, has not been proved to be an unreasonable restraint for a new entry in the market. Experts for both sides recognize the rightfulness of a diminution of a newcomer. The record warrants the conclusion that a just tolerance would permit a decrease of his share initially to the formula followed in this case, to-wit, a full quota for the first unit, 50% for the second and 25% for the third. This court has sanctioned a less-than-average time allowance to a fresh entrant. Asheville Tobacco Board of Trade, Inc. v. F. T. C., 263 F.2d 502, 511 (4 Cir. 1959); Asheville Tobacco Board of Trade, Inc. v. F. T. C., 294 F.2d 619, 625 (4 Cir. 1961). It must be remembered that this plan was only transitory, giving adequate time for preparation of a permanent arrangement.

Our agreement with the District Judge that the temporary plan is innocent of antitrust guilt is placed on the statute's terms. No unjust combination, conspiracy or monopoly is discernible. Rather, there was a bona fide and diligent effort to permit fair and just trading on the Danville Tobacco Market. The Association was in effect a board of trade seeking an equitable adjustment among the warehousemen of the constants of supply, selling time and buyers, all of which had been lawfully fixed. American Federation of Tobacco Growers v. Neal, 183 F.2d 869, 870 (4 Cir. 1950). All of its members, as the pleadings reveal, were quite sensitive to antitrust policy. The suit's very object was to tailor the Association's floor space regulation to a pattern coming within these statutes.

Of course, there was some restraint of trade, but what was done was done from unimpeachable motives and under the aegis of the District Court. This is a factor to be weighed in assaying the reasonableness of the restraint. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). In fine, we are not convinced it was excessive. Asheville Tobacco Board of Trade, Inc. v. F. T. C., supra, 263 F.2d 502, 511.

■ III. To impeach the decrees, attack is mounted by B–B upon the ground that the master appointed by the District Court was unqualified and disqualified. The argument is utterly unsound. It wholly misconceives his place in the suit. Besides, the appointment was made with the full knowledge and consent of B–B, even to the selection of the person to be master. True, he was not a lawyer, but the Federal Rules of Civil Procedure contain no such requirement. Rule 53(a).

He was an official of the Bright Belt Warehouse Association who had testified in the case before his appointment and who testified thereafter. If B–B may object despite its contrary representation to the Court, still there was no error in his appointment and service. "Master" was a misnomer. In truth he did not serve as a master in the sense of being a commissioner of reference or master in chancery. He did not take evidence; he did not resolve any factual disputes; he made no rulings of law. Impressed with his marked knowledge in tobacco marketing, demonstrated in his testimony, the Court chose him as an expert for its guidance. He was subject to questioning as a witness before and after his counseling advice to the Court. Rightfully, and with every propriety, he expounded to the Court and the parties the techniques of the subject in suit.

It is a practice frequently resorted to in litigation, especially in patent and scientific cases. See Scott v. Spanjer

Bros., Inc., 298 F.2d 928, 930 (2 Cir. 1962). Incidentally, he served without compensation and even enlisted the aid, on the same basis, of a competent and disinterested attorney to help him propound his views. All of this was known to the Court and to every party, without the slightest reservation by any of them, including B–B.

The aspersions deliberately directed at the master in the briefs of B–B's counsel, attempting to impugn his motives, and the disparaging references to the trial judge, are entirely unfounded. We deplore such tactics and condemn them.

IV. The permanent plan approved for 1964 and subsequent years adopted generally, as noted, the experience system. It provides for allotments on the unit basis. Each warehouse area of 87,500 sq. ft. will be considered a unit. Twenty-one (21) units have been found in the Danville market. The total selling time of 8800 baskets will be apportioned among the 21 units equally, except a new member will be awarded selling time at the rate of 75% for his first unit, 50% for his second unit and 25% for subsequent units. An 8% gain or loss limitation annually upon the selling time is included, based on the total selling time of the particular warehouse. The authorities approve a restriction of this kind when reasonable. Asheville Tobacco Board of Trade, Inc. v. F. T. C., supra, 263 F.2d 502, 511; Asheville Tobacco Board of Trade, Inc. v. F. T. C., supra, 294 F.2d 619, 629 (4 Cir. 1961).

Heretofore we have indicated the inaptitude of a court's machinery to prescribe and administer a prospective plan, such as that required for the operations of a tobacco market. It is a matter requiring a fluidity of procedure and an expertise not possessed by courts. Inasmuch as the Association is performing a governmental function, it seems meet and right to seek the advice of the Federal Trade Commission in the instant controversy. That body has the procedural adaptability and a familiarity with the subject necessary to consider and adjudge the workability and legality of a plan for the Association. Accordingly, we will suspend pro tempore so much of the decree of the District Court as finally approves the permanent plan, and remand the cause with directions to the Court to refer the permanent plan forthwith to the Federal Trade Commission, requesting it to investigate and advise the Court upon the validity of the proposed plan or to prescribe an appropriate plan. See Rules of Practice, Federal Trade Commission, 16 C.F.R. § 1.11, 15 U.S.C.A., following § 45 (1963 Supp.). See United States v. Radio Corp. of America, 358 U.S. 334, 346–352, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); Note, 51 Harv.L.Rev. 1251, 1253 (1938); F. T. C. v. Morton Salt Co., 334 U.S. 37, 54, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); F. T. C. v. Cement Institute, 333 U.S. 683, 726, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

In the event the Federal Trade Commission is unable to complete its study before the commencement of the 1964 selling season, the Danville market should be permitted for that year to proceed on the basis of the permanent plan. In the circumstances and on the present record, it does not appear to us to be such an unreasonable restraint of trade as to preclude its utilization until further exploration and study of the problem can be consummated.

V. The appeal pressed by Producers poses questions of management, direction and regulation of the auction sales as well as equitableness of the plans. The first point pertains to the discipline and administration of the Association. This grievance must be submitted to the governing body of the Association before resort to the courts is in order. The general fairness of the plans, as we have observed, was an analysis not appropriate for the Court.

The orders of the District Court entered in regard to the 1962–1963 selling seasons are affirmed, the orders in reference to the selling seasons of 1964 and subsequently are suspended and the action remanded for proceedings consistent with this opinion. The District Court

should retain jurisdiction of the cause for such further orders as may become requisite in the final settlement of the controversy.

Affirmed in part and remanded with directions.