The DANVILLE TOBACCO ASSOCIA-
TION, a Corporation

v.

BRYANT–BUCKNER ASSOCIATES,
INC., et al.

Civ. A. No. 518(D).

United States District Court
W. D. Virginia,
Danville Division.

Feb. 9, 1966.

Edwin B. Meade, Meade, Tate, &
Meade, Danville, Va., for The Danville
Tobacco Association and The Danville
Warehouse Co.

Robert F. Ward, Ward & Jones, Chat-
ham, Va., and I. M. Biggs, Lumberton,
N. C., for Bryant-Buckner Associates,
Inc.

Allan Garrett, Earle Garrett, Garrett,
Garrett & Smith, Danville, Va., and G.
Kenneth Miller, May, Garrett, Miller,
Newman & Compton, Richmond, Va., for
Producers Tobacco Co., Inc.

John W. Carter, Carter & Carter, Dan-
ville, Va., for Neal's Warehouses, Incor-
porated and Motley's Warehouse.

W. Carrington Thompson, Chatham,
Va., for Warren's Warehouses.

C. Stuart Wheatley, Clement, Wheat-
ley, Winston & Craig, Danville, Va., for
Piedmont Warehouse and Hughes Ware-
house.

DALTON, Chief Judge.

This case has had a long and difficult
route.

Beginning in 1962 with newly adopted
regulations restricting newcomers to the
Danville tobacco market, the Danville
Tobacco Association filed an action in
this Court seeking a Declaratory Judg-
ment. After hearings, this Court struck
down as unreasonable, certain limitations
imposed, set up allotments of selling time
for the year 1962, and referred the case
to a Special Master, Honorable Fred S.
Royster, for study and recommendations
with respect to regulations suitable for
the governing of the operation of the
Danville market in the years after 1962.

Mr. Royster is a man with many years
of experience in the operation of tobacco
warehouses and many years of observa-
tions and study of the conduct of the
Bright Belt tobacco markets and the al-

location of selling time thereon. He is generally regarded as an expert in that field, and the Court found and finds him to be such expert.

The Report of the Special Master was filed on March 6, 1963, and is as follows:

REPORT OF SPECIAL MASTER

The controversy in this case centers around the problem of warehouse "selling time". The facts relating to that problem, hereafter found and recited in this Report, are based upon the evidence in the record and on matters of which the Special Master has taken, and the Courts can take, judicial notice.

1. *Background of Tobacco Handling and Marketing, and of Origin of "Selling Time"*

The tobacco sold at Danville is Flue-Cured Bright Tobacco, produced in the "Old Belt" portions of the Flue-Cured Bright Belt.

Bright Tobacco, which is flue-cured after it ripens, is grown in Florida, Georgia, South Carolina, North Carolina and Virginia, and matures progressively in that order as a season advances from June through October.

Practically all flue-cured bright tobacco (Hereafter called Bright Tobacco) is sold at public auction in large, specially built, well lighted warehouses by skilled warehousemen who begin the bidding for tobacco. They have the very unusual privilege and duty of placing additional bids on the tobacco (for purchase by the warehouse) for the purpose of securing a price for the tobacco which appears to the warehouseman to be fair. In other words, it is the duty and privilege of warehousemen to protect the grower against having his pile of tobacco sold below what is a fair price. In order to perform this essential service, the warehousemen must be expert judges of tobacco. They must have the financial ability to buy the customer's tobacco, if necessary to protect the price. They must have the incentive and the initiative to enter enthusiastically, wholeheartedly and effectively into the bidding.

Over a period of many decades, it has been found that a brisk auction sale produces best prices. It has been found that the desirable rate of sale, and the maximum rate of sale, is 400 baskets per hour. That rate has been set for the warehousemen by their trade association and has been used successfully by the warehousemen for many years.

Another prime essential of satisfactory auction sales is the presence of a number of buyers sufficient to assure really competitive bidding. Such essential is achieved by the presence on each market of representatives of nearly all of the seven or eight largest buyers.

Another essential has arisen in the last 25 years. The welfare of the Bright Tobacco growing section, the economy of the Southeastern States, the economy of the Nation, have called for and have received Governmental action in the form of control of tobacco acreage and support of tobacco prices. So, an absolute essential of every tobacco auction market is available price support at the time and place of the offering of the tobacco at auction. The Commodity Credit Corporation, the Government agency which has the task of furnishing tobacco price support, has its own agency, the Flue-Cured Tobacco Cooperative Stabilization Corporation. That agency arranges to receive every pile of tobacco which is offered for sale at auction and fails to bring one bid over the support price for the grade given to that pile, and which the owner desires to deliver to Stabilization.

Necessary arrangements have been made by Stabilization for the receipt of tobacco on the day of its sale and for the payment of the support price by the receiving warehouse to the grower, immediately after it has been offered for sale.

Flue-cured tobacco has been subjected to very intense heat in the curing barns just before the completion of the curing. The leaves have become very dry and very brittle. They will crumble upon handling. After curing, the fires are put out, the curing barn doors are opened, and the cured tobacco is left hanging in

the barns on sticks until damp night air or humid day air has put enough moisture in the leaves to permit handling without crumbling. Then the dampened tobacco is taken out of the curing barn to a dry, tightly enclosed pack barn where it is stored in bulk. In the pack barn, the leaves again become dry and brittle. In such a place and in that dry condition, the leaves will keep for an indefinite period of time. When the grower gets ready to take his tobacco to market for sale, he opens the pack barn doors and windows and permits the tobacco to accumulate moisture again from night air and humid day air. When sufficient moisture has been accumulated to permit handling without crumbling, he takes the moist tobacco to market. It is nearly always offered for sale on the day it gets to market or on the following day. Immediately after the sale or after delivery to Stabilization, it is shipped to a redryer and again it is made very dry and is packed carefully in hogsheads or boxes. In that condition, it can remain in dry storage for a number of years.

To prevent serious damage to the tobacco, it must be sold and shipped and redried within a short period of time, usually not more than a few days after having been prepared for market.

Flue-cured tobacco auction sales areas have been divided into five Belts, Georgia-Florida, South Carolina-Border, Eastern North Carolina, Middle and Old. For many years the markets in those belts have been opened progressively following the tobacco maturing season. The opening dates for the first, the Georgia-Florida Belt, have generally been from mid to late July. The opening dates for the last Belt, the Old Belt, have generally varied from early to mid or late September.

Buying companies have arranged to provide buyers for all of the tobacco expected at each market at the time normally expected. Buying companies and Stabilization have arranged to provide shipping, redrying and storage for all of the tobacco expected to flow through the markets normally.

According to the expected flow of tobacco, the buying companies send to a given market from one to five sets of buyers. The determination of how many buyers to send to a market is one solely for the individual companies. Kinston Tobacco Board of Trade v. Liggett & Myers Tobacco Company, et al., 235 N.C. 737, 71 S.E.2d 21 (1955).

If the tobacco offered for sale at a given market exceeds the capacities of the buyers to buy, or the capacities of the companies or of Stabilization to ship and redry, then the market price collapses and the tobacco will suffer very serious physical damage. So, it is necessary for there to be a limit on the amount of tobacco which can be offered for sale on a given day at a given market.

Normally this limit is the physical limitation on the activities of the men who buy the tobacco. For many years, it has been determined that a buyer should not and could not bid effectively under auction market conditions for a day consisting of more than 5½ working hours. Therefore, the normal selling time for a buyer is 5½ hours. This is translated in terms of baskets of tobacco on the basis of 400 piles per hour. So, the selling time for any market is 5½ hours times 400 baskets times the number of sets of buyers at that market.

Danville has four sets of buyers. So, Danville's selling time in terms of baskets, is 5½ x 400 x 4 equals 8800 baskets.

Sometimes, because of unusual conditions, the flow of tobacco is such that the shipping facilities or the redryers become unable to take care of the tobacco. In cases of such emergencies, Stabilization cannot receive all of the tobacco and the companies will not buy tobacco. The market will collapse and the tobacco will spoil. So, on such occasions, it becomes necessary to reduce the flow of tobacco by the declaring of a complete marketing holiday for several days or by a reduction in the hours of selling time.

The determination of the allocation of selling time to the individual markets

according to sets of buyers, and the determination as to the declaring of a market holiday or the reduction of selling hours to meet emergencies, have to be made by some person or agency. In the past 10 or 15 years, each such determination has been made by a voluntary non-profit tobacco warehousemen's trade organization known as Bright Belt Warehouse Association, Inc. That Association embraces in its membership practically all of the auction warehousemen operating in Florida, Georgia, North Carolina and Virginia, and some of the warehousemen in South Carolina. The warehousemen who are members of the Bright Belt Warehouse Association and the warehousemen who are not members of that Association, including those South Carolina warehousemen who have their own warehousemen's trade organization, have uniformly followed the limitation of selling time and market holidays by the Bright Belt Warehouse Association.

The United States Grading Service has uniformly followed the allocation of selling time and the limitations on selling time as determined by the Bright Belt Warehouse Association.

The Commodity Credit Corporation and Stabilization in providing support have uniformly followed the allocation of selling time and the limitation of selling time by the Bright Belt Warehouse Association.

Upon occasions, Stabilization, because of an emergency in its operations, has requested action by the Bright Belt Warehouse Association, Inc. in reducing selling time or declaring a market holiday.

In this court, no party or person has questioned the necessity of the allocation of selling time or the propriety of the decisions being made by the Bright Belt Warehouse Association.

Hereafter in this Report, reference will be made to cases involving selling time as distributed among the warehousemen on a single market, those cases being in the State Courts, in the Federal Trade Commission, and in the Federal Courts of the Fourth and Fifth Circuits. However, in each one of those cases, recognition and approval, either tacit or express, have been given to the need for the allocation of the selling time to each market by some agency, and to the practical propriety of such allocation by the Bright Belt Warehouse Association under the conditions which have been described above.

The recital of the above facts has been made in order to make a record of the background from which the present controversy springs.

2. *Selling Time Problems at the Local Level*

In every instance, the selling time which has been allocated to a given market, based upon the set or sets of buyers at that market, must be distributed among the warehousemen on that market. The Bright Belt Warehouse Association has never had anything to do with the allocation of the selling time among the warehousemen of a particular market. It and every other agency concerned have taken the position that that is the obligation of the operators on that market, either by agreement among themselves or by rule of a Tobacco Board of Trade or other board or association of the tobacco men on that market.

Again, the propriety, the necessity, of a reasonable allocation at the local market level by the warehousemen or by a trade association at that level, has not been questioned in this case and has been approved by tacit approval or by express statement in the cases which will be referred to later.

The problem which is presented in this controversy is presented because the warehousemen in the Danville market have been unable to agree among themselves as to how available selling time should be allocated in 1962 or shall be allocated in 1963 and thereafter. Not only were they unable to agree, but they have been unable, by trade association action (by the Danville Tobacco Association) to present to the Court an acceptable distribution for 1962, or an accepta-

ble plan of distribution for 1963 and thereafter. They have prayed the Court to adjudicate the matter and to enter a declaratory judgment determining those issues.

The Court, on June 14, 1962, entered a declaratory judgment setting forth what would be a proper and acceptable allocation of selling time for the year 1962. That judgment by the Court was accepted by the Danville Tobacco Association, and by the Danville warehousemen. No appeal was taken from that judgment. Operations for 1962 have been performed pursuant to that judgment.

However, there has not yet been any solution offered by the warehousemen or by the Danville Tobacco Association of the problems of adjustments of selling time in 1963 or of the problem of how to handle the matter of the entry of new warehouses or the building of additional warehouse space. They have continued to ask the Court to enter a declaratory judgment on these matters in order that the market may proceed and serve the growers and the public in the year 1963 and thereafter. Without objection by any party, the Court appointed a Special Master to make recommendations as to the solution of these problems.

The determination of what would be a reasonable method of the adjustment of selling time from time to time to take reasonable recognition of competitive efforts and to provide reasonable allocation of selling time to new and added units, requires a study and a consideration of conditions which have made the problems so acute and so difficult and a consideration of the problems which must be met in any attempted solution.

When there was a need for restriction of selling time as above explained and when there was a restriction of selling time, there began to develop a series of very difficult problems for warehousemen. From the beginning and now those problems fall broadly into two classifications: First, the problem of the allocation of available selling time among existing warehouses on a market: Second, the allocation of initial selling time to a new warehouse. In each instance, there are involved problems of reasonable action, preservation of competition, and the avoidance of unreasonable restraints of trade.

In the earlier days of restricted selling time, the problem was not so acute because there was no general surplus of warehouse space and because World War Conditions and there aftermath from 1941 to approximately 1947, made the obtaining of building materials difficult. In those earlier days, the warehousemen on the market were either able to reach an agreement among themselves or they took the easiest course to solve the controversy by the allocation of selling time according to available warehouse floor space. This is the so-called "floor space system" which was almost universally prevalent until the late 1940's and is widespread today. When building materials became available and credit became easier in the late 40's and early 50's, there was an epidemic of new tobacco warehouse construction. There developed controversies which resulted in law suits. The basic problems of competition and the entry of new warehouses persisted and became worse.

It soon developed that the floor space system gave little if any recognition of competition. It was the anomalous situation that a man with merely enough money to build a large warehouse building or to lease a large warehouse building could obtain a large amount of selling time and what amounted to a "free gift" of a thriving, prosperous large business even though he might have had no experience in tobacco, or ability to judge the quality of tobacco. He would get the business merely because he had selling time and because there was more tobacco brought to the market than could be sold by the other warehouses within the limits of their selling time.

This "free gift" of a going business soon attracted to the warehouse field many people who were interested primarily in building and in leasing, or in transferring quickly, selling time achiev-

ed solely by the building of a structure. It soon became apparent that warehouse competition was destined to be limited to competition in the size of buildings. The elimination of competition in service was a certain consequence. Thus, there became prevalent throughout the tobacco area building epidemics which could be called building wars. So, from 1946 until the present day, in most markets including Danville, there was added sufficient warehouse floor space to much more than take care of all of the tobacco that could possibly be sold with the available sets of buyers, and provide ample storage and handling facilities. Floor space, although retaining some significance, had lost most of its significance.

As this chaotic situation developed, there developed along with it a concept of a different method of allocating selling time, the so-called "experience method" and later the "modified experience method".

Beginning in 1949, in a law suit which developed from the Henderson, North Carolina Market, in the United States District Court for the Eastern District of North Carolina, before Judge Gilliam, there was tested the experience system.

That system in brief was to take the selling time status as it existed for the preceding season, the status which had been acquiesced in by the operators of that market for the latest operating season, and introduce the new and theretofore lacking element of competition in service by providing for the adjustment of selling time at the end of each season, based upon the competitive experience among the warehouses. A warehouse which sold tobacco in excess of its percentage of selling time would gain some additional selling time. A warehouse which sold less tobacco than its percentage of selling time would lose some selling time. Thus competition was again provided.

An immediate problem which arose under that was the problem of reasonable limitations of gains or losses of selling time by any one warehouse. This problem was made acute by a number of foreseeable events. By reason of a crop failure in a certain area, or some health or fire or other disaster to a warehouseman, there might be an unusual loss of selling time which was not normal and for which he should not be penalized. On the other hand, the temptation of the gain of selling time might result in discrimination, rebates, false resales or other improper and detrimental practices by warehousemen. Therefore, very early, those markets going to the experience system introduced a modification of limiting gains and losses by a warehouse in any one year to a certain percent of the selling time of the warehouse. The query remained as to what was a reasonable limitation.

Another problem which arose was the problem of limiting resales. In order to avoid a distortion because of an unreasonable or invalid number of resales, an effort was made to put a reasonable limitation on them. A modification of that problem was whether, if there be no limit on resales by speculators, should there be a reasonable limit on resales by a warehouseman of tobacco purchased for the warehouse account.

With respect to the addition of new warehouses, there has been great controversy, particularly that as reflected in two cases in the United States Circuit Court of the Fourth Circuit. In allocating selling time to a new warehouse, should any credit be given to floor space in excess of the average unit for the market? If some credit should be given, must it be full credit? If some credit must be given, but full credit need not be given, what is a reasonable credit for such surplus floor space (which has little if any significance in connection with the reasonable and proper operation of the market)?

A third problem was presented as to whether in the so-called "free gift" of floor space to a new entrant would it be reasonable or unreasonable to put such new and untried operator on an even basis with those experienced, expert, and time-tried operators who had built up their business by approved operations for

many years. On the other hand, was it reasonable and justifiable to allocate to a new entrant something less than a unit allocation for the first year and leave improvement of that allocation to the industry, initiative and good service of the entering warehouseman.

Another and persistent problem was the problem to prevent excessive building for the purpose, not of rendering competitive service to growers, but for the sole purpose of acquiring, quickly, initial selling time and disposing of that selling time at a profit by lease or merger with another warehouse.

All of these problems presented the necessity of trying to reach a proper balance between the prevention of devastating economic warfare, which would be against the public interest, and the prevention of unfair and damaging trade practices, on the one hand, against the necessity of permitting the play of competition and of permitting the entrance of new operators upon reasonable terms.

In other words, it being apparent that there must be some restraint upon operations, what was reasonable restraint?

3. *Guidance from the Decided Cases*

The cases decided in the Federal Trade Commission, in the State Courts and in the Federal Courts, particularly the latest case decision, that of the United States Circuit Court for the Fourth Circuit handed down on September 21, 1961, point the way to the handling of some of the most difficult problems which have been described above.

The North Carolina Supreme Court in the case of Gray v. Central Warehouse Company, 181 N.C. 166, 106 S.E. 657 (1929) said that the sale of tobacco at tobacco warehouses is a business affected with the public interest.

However, the North Carolina Supreme Court also later held in Kinston Tobacco Board of Trade v. Liggett & Myers Tobacco Company et al., 235 N.C. 737, 71 S.E.2d 21 (1955), that a tobacco board of trade (and a court asked to enforce a board of trade order) cannot compel buying companies to send buyers to a

tobacco market. It said "This is revolutionary in principle and strikes at the heart of our free enterprise system."

In two Virginia cases as early as 1925, Reaves Warehouse Co. v. Commonwealth, 141 Va. 194, 126 S.E. 87 (January, 1925), and Danville Warehouse Company, Inc. v. Tobacco Growers Cooperative Association, Inc., 143 Va. 741, 129 S.E. 739 (October, 1925), the Supreme Court of Virginia held that the conduct of an auction tobacco warehouse business is affected with the public interest.

The United States Circuit Court of Appeals for the Fourth Circuit in American Federation of Tobacco Growers v. Neal, 183 F.2d 869 (1950) held that the Danville Tobacco Association is the equivalent of a local tobacco board of trade.

## CASES ON THE EXPERIENCE SYSTEM

### THE HENDERSON, NORTH CAROLINA, CASE.

The modified experience system of allocating and adjusting selling time came before a Court in 1949. In Robertson, et al. v. Henderson (N. C.) Tobacco Board of Trade, et al., in the Federal District Court for the Eastern District of North Carolina at Raleigh, North Carolina, No. 342, District Judge Don Gilliam held (May 13, 1949) that the experience system was valid and reasonable and not in illegal restraint of trade. No appeal was taken.

### THE WILSON, NORTH CAROLINA, CASE.

In 1954, upon complaint of an interested warehouseman, the Federal Trade Commission made inquiry into the action of the Wilson North Carolina, Tobacco Board of Trade in taking that market off the floor space system of allocating selling time and putting it on the experience system. The Examiner and the Federal Trade Commission approved and held the experience system valid and not in illegal restraint of trade. In the Matter of Wilson Tobacco Board of Trade,

Inc., FTC, Docket No. 6262, (Opinion 1955).

In that case the Federal Trade Commission also upheld the Examiner and his ordering that a limitation on speculators' resales of tobacco (in the determination of experience for a season) was an unreasonable restraint of trade.

## THE DOUGLAS, GEORGIA, CASES (THE ROGERS CASES)

There have been two cases in the Circuit Court of Appeals of the Fifth Circuit.

Rogers v. Douglas (Georgia) Tobacco Board of Trade, 244 F.2d 471 (Fifth Circuit, May 9, 1957), involved an action for triple damages under the Sherman Anti-Trust Act alleging conspiracy and illegal restraint of trade in the allocation of selling time on the experience basis. Defendant moved to dismiss and for a judgment on the pleading. The District Court granted the motion. There was an appeal.

The Circuit Court held that the experience (performance) method of allocating selling time was clearly legal and it quoted from the Federal Trade Commission in the Wilson Board of Trade case as to why it is clearly legal. The Court said in effect that the "why" is that it provides competition, puts emphasis on service, and penalizes laziness.

However, the Court remanded the case for trial on the question of whether a limitation of 3½% on gain or loss of any warehouse in any season is an undue limitation. On this point, the Court said in part "If further evidence upon remand shows that such limitation tends to prejudice public interest it may constitute an undue and unreasonable restraint of trade and commerce."

Upon remand, the case went to the jury on the point of whether a limitation of gain or loss to 3½% was unreasonable restraint. The jury found for the defendants.

On appeal, the Circuit Court in Rogers v. Douglas Tobacco Board of Trade, 266 F.2d 636 (Fifth Circuit May 5, 1959) held

1. The experience system of allocation of selling time is valid and legal

2. A reasonable restriction on gain or loss is not illegal

3. Whether 3½% is reasonable is a matter for a jury (in an anti-trust suit)

4. The District Court erred in permitting the jury to pass on the question whether auction tobacco sales are transactions in interstate commerce, that question being one of law and having been determined in the affirmative.

## THE ASHEVILLE, NORTH CAROLINA, CASES (FOURTH CIRCUIT)

There have been two cases in the United States Circuit Court for the Fourth Circuit involving appeals from decisions of the Federal Trade Commission on complaints against the Asheville, North Carolina Tobacco Board of Trade shifting from floor space in the allocation of selling time.

In Asheville Tobacco Board of Trade v. Federal Trade Commission, 4 Cir., 263 F.2d 502 (1959), the Circuit Court remanded the matter to the Federal Trade Commission for additional findings of facts with respect to the cease and desist order which that Commission had issued. In that case, the Circuit Court held

1. It is a system substantially in the public interest in maintaining free and open competition among warehousemen on tobacco auction markets.

2. The Circuit Court did not reverse the Commission on its finding that a 3½% restriction on gains or losses is unreasonable restraint. It upheld the finding as supportable. It said in part: "The condemnation of the 3½% limit is clearly justified."

3. "A reasonable limitation on the percentage of gain or loss in any one year would not violate the anti-trust laws."

4. The cease and desist order was not clear particularly on the point as to whether the Commission, in the computation of initial selling time for a new warehouse had required that full credit be given for full size or merely that the Board of Trade must take "such size and

capacity into account and adopt a rule which gives reasonable weight to this factor."

Upon that remand, the case went back to the Trade Commission and it amended its findings, making it clear that it did not require that full credit be given for size and capacity. The case went again to the Circuit Court.

In Asheville Tobacco Board of Trade v. Federal Trade Commission, 294 F.2d 619 (Fourth Circuit September 20, 1961), the Court affirmed the final action of the Federal Trade Commission, and in doing so, it held

1. The performance system of allocating selling time is reasonable

2. That some provision must be made for new warehouses entering the market

3. Some reasonable limitation on gain or loss is legal

4. Over building should not be encouraged

5. In allocating selling time to new warehouses there must be given reasonable credit to "size and capacity of new entrant."

### 4. *Findings of Fact*

The Special Master finds the facts to be as they are set forth heretofore in this Report.

### 5. *Conclusions of Fact*

Upon the record in this case and upon the facts found as they appear heretofore in this Report, the Special Master has reached and finds the following conclusions of fact: ·

1. The adoption by the Danville Tobacco Association of a modified experience basis of allocating selling time on the Danville Market in 1963 and thereafter will best serve the public interest, will preserve and will promote healthy and vigorous competition among warehousemen in serving the public and will best promote a healthy, orderly and sound auction tobacco market at Danville.

2. It is reasonable and fair and best calculated to prevent discrimination and unfair trade practices if the gain or loss of a warehouse in any one year is limited to an amount not in excess of the upper limit of what can be reasonably anticipated under normal conditions and under fair and vigorous competition. It was the unanimous view of all of the parties to this dispute in the hearings held, in which conclusion the Special Master concurs, that 8% of sales by the warehouseman is such a limit which is close to the upper limit of gain or loss obtainable in a normal year under normal and fair trade practice conditions. Most of the warehousemen thought the 8% figure was too great.

3. That under present and foreseeable conditions it would not be fair or proper to disregard, in the computation of experience for the purpose of gain or loss, bona fide resales made by speculators and resulting from actual and bona fide purchases by them.

4. That it would be fair and proper and advisable, and necessary in order to guard against improper practices, to limit resales by a warehouseman of tobacco purchased by the warehouseman for his leaf account, and that such limitations should be at or near the upper limit of what experience has shown to be normal warehouse resales for warehouse leaf accounts. It was the unanimous conclusion of all of the parties to this case in the hearings held, in which conclusion the Special Master concurs, that 6% would be such a reasonable limit, at or near the upper limit of resales to be annually expected.

5. That at present the floor space on the Danville Market is more than adequate to serve all market needs now or as they can be foreseen for the reasonable future; that additional floor space on the Danville Market will have little significance; that much less than full consideration should be given to floor space in computing an allocation of selling time for floor space added to an existing warehouse; that it is fair and reasonable and gives to such added floor space the maximum consideration to which it is entitled if additional selling time for added floor space should be not

more than 50% of unit selling time if the addition is to a single existing warehouse unit and 25% of unit selling time if the addition is to two or more existing units.

6. That new operators desiring to come into the Danville Market, having no established business there and facing the necessity of building a business and good will and of gaining experience in serving the public on the Danville Market, should receive for a unit of new warehouse space something less than a unit of selling time and should reasonably be required to acquire additional selling time by competitive experience, thereby earning in some degree at least, selling time such as an established and well known and experienced warehouseman on the market has earned for a similar unit; that a reasonable and fair allotment of initial selling time to an operator with a proper warehouse having a floor space area equal to a unit of the Danville Market floor space, would be 75% of a unit of selling time, and a reasonably fair allocation for a new floor space in addition to such single new unit would be 50% of unit selling time for the first additional unit of floor space and 25% of unit selling time for each added unit.

7. That reasonable rules should be adopted relative to the disposition of selling time questions which may arise upon transfers, mergers, retirement and other disposition of warehouses and that reasonable rules and regulations should be adopted designed to prevent improper traffic in selling time tending to reduce competition and to harm the public.

## 6. *Recommendations*

The rules which are recommended next in this Report are reasonably designed to carry out the conclusions stated above.

It is recommended that this Court approve the following recommended procedures and rules for adoption by the Danville Tobacco Association as being proper and as meeting the requirements of law and the requirements of this Court as to rules and regulations not in unreasonable restraint of trade. It is further recommended that the Danville Tobacco

Association adopt such rules after such approval by the Court, and that if and when the Court has approved such rules the Danville Tobacco Association adopt a prefacing statement of conditions and of policy similar in substance to that set forth next hereafter in this Report and immediately preceding the recommended rules.

## 7. *A Summary of the Present Situation*

Selling time is not a property right. No person, firm or corporation can own selling time. No land owner can claim selling time as an accretion to his real estate. Selling time is a result of a decision, to be made as to what is a fair, equitable and legal way to distribute, among the warehouses operating on the market, the selling time available to the market. It must be solved by the warehousemen on that market, or the Board of Trade of that market, either by unanimous agreement or by rule, without unanimous agreement. Because of the intense interest of each warehouseman and his vital stake in his own operations, an agreement is also impossible in a constantly changing situation. A rule, adopted where there is a dissent, invites and produces controversies, many of which go to Court. Adjudication is slow. For the season in which the disagreement occurs, the warehousemen seldom know what are their rights and liabilities.

The warehousemen at Danville were unable to agree on how to divide selling time in 1962. The Court by a declaratory judgment disposed of that controversy and from that judgment there was no appeal. (That judgment is a part of the record in this case.)

The warehousemen at Danville have been unable to agree on the fundamental points which shall control or determine the method of dividing selling time in 1963 and thereafter. They have been unable to agree upon the principles of the necessary allocation of selling time to any new warehouse seeking to enter the Danville Market for the season 1963 or there-

after. They desire to do what is equitable and what will afford recognition of the results of fair competition. They have petitioned the Court to settle their real and dangerous and threatening disputes and to settle their existing controversies by declaring to them what are acceptable general and specific rules to be adopted now to govern the allocation of selling time in 1963 and in subsequent years. They have presented to the Special Master numerous factual situations which have arisen in the past and have not been settled satisfactorily. They have alleged that those situations will most surely arise in the future. They wish to adopt rules in as much detail as possible, to become effective now. They cannot agree upon any such rules. About these rules there exists a real dispute. The parties wish this Court to declare what rules this Court will approve for adoption now.

8. *Recommendations of Rules and Regulations*

The Special Master after further hearings and after lengthy considerations, recommends that the following rules be approved for adoption by the Danville Tobacco Association, Inc.

8A. *The Modified Experience System and Adjustments to be Made as a Result of Fair Competition*

1. A warehouse unit on and in the Danville Market is identified as a building which is suitable in every respect for selling leaf tobacco at auction in an efficient manner, and which is available therefor, and which is in compliance with the requirements of the Danville Tobacco Association Rules and Regulations relating to the construction and maintenance of tobacco sales warehouses. Provided that the requirement as to "available therefor" shall be satisfied if it is determined, on the day when the allocation of selling time is made for an approaching season, that the warehouse is available for that season; and provided, further, that the requirements as to "available" shall not apply to any warehouse which, on September 10, 1962, was under an uncancellable lease, until said lease shall have expired. Each warehouse area measuring 87,500 square feet shall be considered a unit and any proportionate part thereof shall be considered that percentage of a unit. At the time of the opening of the 1962 Danville Market there were on the market 21 such units. (This includes three units for Bryant-Buckner and 1⅗ units for Warren.)

2. Original selling time is that which existed for each tobacco warehouse on the opening date of the 1962 Danville Market.

3. Selling time for the 1963 season shall be the same as that for the 1962 season, subject only to such adjustments as may become necessary by reason of the admission of new warehouses, additions to existing warehouses, withdrawals, transfers, leases and mergers, as hereafter provided in these rules and regulations.[1] Beginning with the year 1963 adjustments of selling time for competitive gains or

---

1. Originally the Special Master recommended that the experience system adjustments be applied to the 1962 season experience in determining adjustments for 1963. The Special Master has given careful and continued consideration to that recommendation, and has reached the conclusion that the application of the experience system should be first to the 1963 sales and be applied to the selling time allocated for the 1964 season. The reasons for recommending deferring the application of the experience system and not applying it to the 1962 experience were that at no time during the 1962 season had the Danville Tobacco Association adopted a modified experience rule, at no time during the 1962 season was it sure that there would be such a rule, and at no time during the 1962 season did the Association observe or police the 1962 sales as such sales should be observed and policed in accordance with such rules and regulations as may be adopted as a part of such experience system. It is the conclusion of the Special Master that it would not be fair to apply an experience system to a season when the rules governing such an experience system were not in existence.

losses shall be made at the end of the 1963 season so as to reflect the valid and credible experience of each warehouse to which selling time was allocated in 1963, such adjustment to be made on the basis of producers sales in pounds plus bona fide resales. Bona fide resales shall mean sales of all tobacco in the regular auction sale which has been purchased previously by warehousemen or by dealers, and on which the warehouse receives full commissions, and with respect to which the party selling the tobacco receives payment therefor from the warehouseman; provided, that the above limitations relative to full commissions and payment from warehousemen shall not apply to sales by a warehouseman of tobacco purchased for his leaf account; and, provided further, that no experience credits shall be given for a warehouseman's leaf account resales which exceed 6% of total sales of that warehouse during the season. No warehouse shall gain or lose, at the end of the season, more than 8% of the selling time which it had during that season; and, provided, further, that total baskets gained shall be limited to total baskets lost (available after application of the limitation on losses), and if baskets lost are less than baskets gained, the available baskets lost shall be distributed among the gainers in proportion to the gains to which they would have been entitled, and if baskets lost shall exceed baskets gained, the surplus shall be distributed in like proportion back to the losers. Similar adjustments shall be made at the end of each season thereafter.

4. The factual determination of the valid and credible amount of producer's sales plus the bona fide resales, and the computation of the resulting gain or loss of selling time for each warehouse shall be made by the Danville Tobacco Association, Inc., provided, that in making such determination and computations, the Danville Tobacco Association, Inc. shall discard and refuse to consider producer's sales or resales re-sulting in whole or in part or proximately connected with rebates, prizes, rewards, or other discriminations of any kind between customers, or resulting from or proximately connected with any other trade practice or act or transaction by a warehouseman or by his employees which is either illegal or contrary to the legal, reasonable and proper rules of the Danville Tobacco Association, Inc. (or of any other Warehouse Trade Association to which more than 50% of the Danville warehousemen shall belong); and provided further that the Danville Tobacco Association, Inc. shall (upon request) give, to any warehouseman requesting same, a fair hearing and an opportunity to present evidence and argument. Attached to this report as an exhibit to this recommendation and as a part of this recommendation there is a copy of the currently effective rules and regulations of the Bright Belt Warehouse Association, a trade organization of tobacco warehousemen of which more than 50% of the Danville warehousemen are members.

The Special Master recommends that the Court approve those rules and regulations as reasonable and proper and that the Court recommend to the Danville Warehousemen and the Danville Tobacco Association that they abide by those rules and conform to them unless and until they may be changed by the Bright Belt Warehouse Association or unless and until the majority of the members of the Danville Tobacco Association are no longer members of the Bright Belt Warehouse Association.

8B. *The Admission of New Warehouses and Additions to Existing Warehouses*

1. A "new unit" is a warehouse constructed after the market opening of 1962, containing 87,500 square feet of floor space available and suitable for warehouse operations as defined above, whose owners and operators shall be independent of the ownership and operations of any other warehouse facili-

ties on the Danville Market; provided that such unit shall not be a "new unit" if 20% or more of its owners by value, or 20% or more of the operators by number are owners or operators of other warehouse space in Danville. A person shall be considered an "owner" if he owns a legal interest in a warehouse property directly or indirectly, or if he is in practical control of a legal interest in such property or of a person or corporation owning a legal interest in such property. A person shall be considered an "operator" if he is an operator directly or indirectly or if he is in practical control of an operation or of a person or corporation engaged in such an operation.

2. An "added unit" is warehouse space of 87,500 square feet suitable and available for warehouse operations in Danville, either an addition to an existing warehouse or a new structure, which does not qualify as a "new unit" as defined above.

3. "New units" and "added units" and fractional parts thereof entering the Danville Market in 1963 shall receive allocation of selling time as follows:

3a. Prior to the second Tuesday in March, 1963, there shall be computed the number of "new units" of 87,500 square feet and the number of "added units" of 87,500 square feet (provided that new construction or added construction of less than 87,500 square feet shall be treated as a fractional unit), and to the sum of those units there shall be added the number of units remaining from the 1962 season. The total available selling time shall then be divided by the total number of units. The result is a "unit selling time."

3b. To each "new unit" there shall be allocated, for the 1963 season, selling time equal to 75% of the unit selling time.

3c. As "added units" are built, either new buildings, additional floor space in new units, or additions to existing buildings, the computation of additional selling time for such "added units" shall be made after giving full consideration to the units of floor space to which the "added units" attach, or with which they unite in common ownership or operation as defined in B1 above, and the computation of additional selling time for such "added units" shall be made as follows:

(1) For 87,500 square feet of available warehouse space added to a new or to an existing unit of 87,500 square feet, there shall be allocated 50% of a unit selling time.

(2) For each 87,500 square feet of warehouse floor space added to 175,000 square feet or more of warehouse floor space under common ownership or management as defined in B1 above, there shall be allocated 25% of a unit selling time.

4. For each year following the year 1963, the allocation of selling time to new and added units and the handling of withdrawn units shall follow the rules above prescribed for such handling in the 1963 season.

5. Whenever it becomes necessary to provide selling time (as reflected by baskets) to a new or an added unit, such selling time shall be taken from existing warehouses in proportion to their selling time.

8C. *Withdrawals, Transfers, Leases and Mergers*

1. Basically, (and except as herein provided or except as may be changed for proper cause), for the consideration and determination of the question of allocation of selling time, all selling time shall be considered as though allocated to warehouse property and shall follow that property.

2. If a unit is withdrawn from the market, then there shall be released to the market the selling time which that unit would have been entitled to if it had continued on the market, and shall be divided among warehouses in proportion to their selling time.

3. If a unit is destroyed by fire, it may be replaced by a new structure of equal size and then the selling time to which it is entitled shall be that of the old structure.

4. In the event of the death of the owner and operator of a warehouse, the selling time allocable to that warehouse shall remain with the warehouse and may pass to purchasers or lessees of the warehouse in accordance with the provisions set forth in Paragraph C-5 below.

5. The owner of a warehouse, to which there has been allocated selling time, upon sale of the warehouse to a purchaser may assign the selling time as follows:

(a) If the sale is to a new operator, one who is not currently operating on the Danville Market or who is not in a common ownership or common operation of another warehouse as defined in B1 above, then the sale may carry with it the full selling time of the warehouse sold.

(b) If the sale is to a person, firm or corporation engaged currently in the operation of a warehouse at Danville or engaged in the common ownership or common operation of a warehouse in Danville as defined in B1 above, then the sale shall carry with it the full selling time of the warehouse sold if the warehouse which is being sold has been in operation for as much as three (3) years; otherwise, the sale shall carry only so much of the selling time of the warehouse sold as would inure to the purchasers if the warehouse sold is treated as an "added unit".

(c) If an owner shall desire to sell a warehouse which he has been operating and to which there has been allocated selling time, and to build another warehouse in another location, he may transfer to his new warehouse selling time from his old warehouse if the new warehouse shall be at least equal in size to that of his old warehouse: Provided, if it is less in size, the sell-

ing time shall be reduced pro rata and, provided, further, that if the new warehouse shall exceed in size the old warehouse, then there shall be transferred to the new warehouse the selling time of the old and to the excess floor space there shall be alloted selling time as to an "added unit", and, provided, further, if the selling time of the old warehouse is transferred to the new, then the old warehouse (if not withdrawn from the market by destruction or conversion in a manner to make it unsuitable for warehouse purpose) shall have selling time only equal to what it would have had as an "added unit" to the warehouse built by the former owner, and provided further, that, if by any conveyance, series of conveyances or otherwise, it should happen that the selling time of the old warehouse exceeds the limit set forth above, the excess shall be deducted from the selling time of the new warehouse built by the former owner of the old warehouse.

(d) In the case of the merger of warehouse interests, the selling time of the merging warehouses shall be unchanged except that if a merging warehouse has been in operation for less than three (3) years, then it shall be considered and treated as an "added unit", added to the warehouse with which it merges.

6. Leases of warehouses shall be governed by principles similar to those provided for sales in C-5 above.

## 8D. Traffic in or Transfers of Selling Time

Except by unanimous agreement of the warehouse operators on the Danville Market,

1. There shall be no transfer of selling time from a warehouse which has been assigned selling time less than three (3) seasons. Provided, that in the event of the destruction of any warehouse by accidental cause or by the elements or in the event of the substantial impairment of its capacity to operate from such cause, then by mutual agreement between the trans-

feror and any transferee, there may be a transfer of selling time to remain in effect until the owner of the destroyed, or impaired warehouse can, and does by due diligence and acting with reasonable promptness, rebuild or repair.

2. There may be a temporary shifting or a loan of selling time from a warehouse which has been assigned selling time at least three (3) full seasons, to another warehouse in common ownership therewith, provided that the lending warehouse shall remain both suitable and available for warehouse purposes during all of the period of such shift or loan.

3. Any allocation of selling time by the Danville Tobacco Association, Inc., except pursuant to the conditions of these regulations shall be regarded as temporary and as a loan and shall not change the basic selling time achieved by a warehouse under these regulations. If after a temporary transfer or loan of selling time pursuant to these regulations, or by virtue of the unanimous agreement of the warehousemen, the warehousemen of Danville cannot agree upon the allocation of such selling time in the future, then there shall be a return to the basic selling time achieved prior to the departure therefrom modified and performed to reflect as nearly as may be possible what the basic selling time for each continuing warehouse would have been had there been no such transfer or loan or modification. If during a period of transferred or loaned selling time, the transferee experiences a loss or a gain of selling time on the experience basis heretofore set forth, then such loss or gain shall be allocated pro rata to the transferor's transferred selling time; and when the transferred selling time returns to the transferor it shall return in such modified condition.

4. In the event that a dispute or controversy arises as to the interpretation or application of the foregoing regulations, or either of them, then such dispute or question arising is to be referred and submitted to the Board of Directors of the Danville Tobacco Association (or to such committee of the Board as may be authorized by the Board to hear and pass upon such matters) for its consideration and determination, and upon a determination by the majority of the Board or its committee, if there be objection to the decision of the Board or its committee, an appeal may be had to the members of the Danville Tobacco Association, who, at a duly called meeting, shall consider such appeal, and a majority vote of the members shall be binding on all parties in interest, and subject, of course, to the right of an aggrieved party or parties to redress in Courts of competent jurisdiction.

Respectfully submitted,
F. S. ROYSTER
Special Master

November 30, 1962

That Report of the Special Master was the subject of study by the parties to the litigation and by many others throughout the tobacco industry. The Report was generally recognized as the product of one highly expert in his field and was acclaimed for its practicality and definiteness. After study by the Court and after further hearings held by the Court, the Report of the Special Master was approved by the Court. The regulations recommended by the Special Master and approved by the Court were adopted by the Danville Tobacco Association. Final approving Order was entered on March 6, 1963. In due time, the case was appealed to the Court of Appeals for the Fourth Circuit. The appeal was argued in that Court on January 14, 1964. The appeal was decided on May 14, 1964, 333 F.2d 202.

The Court of Appeals affirmed the judgment of the District Court in part (that part which approved the legality of the Danville Plan of operation for the year 1962). With respect to the "prospective" feature of the plan, the so-called "permanent plan", the Court suspended "pro tempore so much of the decree of the District Court as finally approves the

permanent plan" in order that the District Court might receive the comments and advice of the Federal Trade Commission. For that special purpose the case was remanded.

Pursuant to the remand mandate of the Court of Appeals the matter was referred, in July 1964, to the Federal Trade Commission with request by the District Court that comments and advice be given as to the propriety of the prospective plan.

A Report of 24 pages was made by the Federal Trade Commission in May, 1965.

Because of difficulty in determining just what the Federal Trade Commission advised with respect to a prospective plan of operation, this Court requested the Federal Trade Commission to clarify and make more specific its Report and advice, if it cared to do so.

In September, 1965, this Court entered an Order approving operations of the Danville market for the 1965 season in accordance with the regulations governing its operations for the years 1962, 1963 and 1964.

Thereafter, on October 16, 1965, the Federal Trade Commission furnished to this Court a Supplemental Report of 8 pages making certain recommendations. The First Report and the Supplemental Report of the Federal Trade Commission are in the record.

After notice to all of the parties to the proceeding, there was a hearing on November 1, 1965, on Exceptions which had been filed to the Reports and Recommendations of the Federal Trade Commission.

After hearing all parties who desired to be heard, the Court entered an Order referring the matter of the Federal Trade Commission Reports and Recommendations to a Special Master, Fred S. Royster, for study and comment and recommendations.

The Second Report of Special Master Royster was filed on December 1, 1965. That report reads as follows:

## REPORT AND RECOMMENDATIONS OF SPECIAL MASTER, FRED S. ROYSTER

TO THE HONORABLE TED DALTON, CHIEF UNITED STATES DISTRICT JUDGE:

The Special Master has received copy of the Court's Order of November 1, 1965, together with the record made in this case. He has considered the record and has given special study to the new matter in the record, namely, the opinion of the Court of Appeals for the Fourth Circuit, the report of the Federal Trade Commission of May 14, 1965, the letters of the Federal Trade Commission in the record, particularly the letter received October 21, 1965, the transcript of the hearing in this Court on September 23, 1965, the supplemental report of the Federal Trade Commission received October 18, 1965, and the transcript of the hearing in this Court on November 1, 1965, with attached exhibits.

It is the understanding of the Special Master that, in the light of such expertness as he may have in the field of tobacco auction marketing, he is to comment on the reports of the Federal Trade Commission, particularly the departures in such report from the decisions of the District Court and the Court of Appeals and is to make such recommendations as he may have with respect to the "Danville Plan".

In order to see more clearly the Federal Trade Commission's departures from the District Court and the Court of Appeals decisions it is thought desirable first to point to the areas of agreement between tobacco warehousemen, the Courts and the Federal Trade Commission.

## AREAS OF AGREEMENT—GENERAL

All agree that the efficient and vigorous conduct of an auction tobacco market is in the public interest. History has shown that such a market achieves for the grower of tobacco prices for approximately 90% of his crop (the part which does not go into the price support corpo-

ration) which are substantially above the government support price. Tobacco warehousemen help to put many millions of dollars into the pockets of tobacco farmers.

All agree that an auction market, which the farmer needs and to which he is entitled, requires able, experienced warehousemen who know tobacco and its grades thoroughly, who know the buyers and their grades and needs, who can sense the opportunity to increase a bid and who are willing to rely on their judgment and risk their dollars in competitive bidding for the benefit of the grower.

Such a successful market also requires properly constructed and spacious warehouses which will be attractive to growers and to buyers and which will have ample space to take care of the existing market needs and to provide an invitation and opportunity for market growth. A market is built by its warehouses and its warehousemen. The Danville market is the largest tobacco market in the world for Old Belt type of tobacco and the second largest in the United States for all types of flue-cured tobacco. It has four sets of buyers. Only one other market in the Old Belt has so many sets of buyers.

In a city much larger than Danville, fifty miles from Danville which is also in the heart of the Old Belt, there is an auction tobacco market with only one set of buyers.

The efficiency and the competition on the Danville market have been notable and productive of public good.

In Danville, as in other Bright Belt tobacco markets, the allocation of selling time to the warehouses on a market has been done by the local tobacco Board of Trade and, until recently, was based predominately on warehouse floor space. From that base, of course, there were variations caused by bargaining, give and take, equitable adjustments, mergers, rentals, etc. For many years there was little complaint about such method of allocation. The building of new and large warehouses constituted a competitive weapon with which to bring more growers to the market.

In recent years, beginning shortly after the conclusion of World War II, the building of many new and larger warehouses and the enlargement of existing warehouses became a weapon or a means to achieve selling time. A stage was reached in most tobacco markets where the addition of new warehouses or added floor space to an old warehouse was little, if any, benefit to the market.

Beginning in 1949 with the Henderson case the Federal Courts have realized and have said just that.

Beginning in 1955 with the Wilson case the Federal Trade Commission has realized and has said just that. The Federal Trade Commission said that again as recently as May 14, 1965, on page 18 of its report in this case.

All have agreed that the public interest now lies in a reasonable restriction or limitation on building.

When such obvious over-building stage was reached on a market the problem then arose as to how to provide a regulation relative to new entrants on the market which regulation would be reasonable and yet would tend to discourage over-building, discourage those more interested in selling time than in securing a competitive opportunity, and which would discourage over-building even by prospective keen competitors or by the warehousemen already in the market.

In trying to determine what is a reasonable restraint on such over-building it was necessary first to get away from floor space as the dominant element in determining selling time for new entrants.

In setting a standard for new warehousemen which would be reasonably fair to old and to new warehousemen it was necessary to determine what was a reasonably fair measuring rod for a "warehouse". It was decided quite early by warehousemen, by the Courts, and by the Federal Trade Commission that the reasonably fair measuring rod was the average of conditions existing at the time

of the adoption of the new method of allocating selling time.

So it was uniformly agreed that a "unit" of measurement was the size of the average warehouse on the market at the time the unit system was put into effect. So, the unit was determined by dividing the total floor space on the market at the time of the adoption of the new system by the number of warehouses on the market at that time. At Danville that approved process produced a unit of 87,500 square feet for a warehouse.

It was next generally agreed that any allocation of selling time to a new entrant should be on the basis of less selling time for the second unit than for the first and, again, less selling time for additional units after the second, provided the new entrant insisted upon building a warehouse the floor space of which exceeded one unit.

Of course, it was the hope of all that the new entrant would build just one unit—its size being the average of the market. The whole basis of the new system has been the use of averages as the situation existed at the time of the adoption of the new system.

The Special Master knows of no disagreement which has occurred on the basic principle that it is eminently fair and, therefore, not obviously unfair, to start consideration of allocation of selling time to the new entrant on the basis of average selling time for the average warehouse on the market.

That is a starting point on which it is thought that all are agreed.

There has been sharp disagreement as to whether it is within the bounds of reasonableness to give to a new entrant something less than the full average for the warehouseman who has been on the market for years and has accumulated good will and regular customers. That point of difference will be discussed later.

What is important here is the uniform agreement as to what is the first measuring rod, the basic unit, the average size of the warehouses on the market.

## THE FEDERAL TRADE COMMISSION'S BASIC MODIFICATION OF THE DANVILLE PLAN

The Federal Trade Commission has proposed one basic and important modification of the Danville Plan. That proposal reached the climax and is spelled out in detail in tabulations made by the Federal Trade Commission on pages 5 and 6 of its Supplemental Report.

In order to understand clearly this proposed modification it is necessary first to look closely at those two pages of the Supplemental Report and see precisely what the Commission has done.

It has listed all of the warehouses on the Danville market, including new Warren No. 3 and Big Sale and making a total of 18 warehouses, and giving the floor space of each warehouse. The warehouses are listed by operating groups. Those are columns 1 and 2 of the tabulation. Then the Commission has taken as a unit the 87,500 square feet, the floor space of the average warehouse before the entry of Warren No. 3 and Big Sale. Then the total floor space of each operating group has been divided by the unit 87,500 and the quotient figures are set forth in column 3.

Although the Commission's tabulation does not give the total of column 3 it is in fact 19.53 units. Of course, according to this method the number of units produced by the 16 warehouses on the market before Warren No. 3 and Big Sale entered is precisely 16. That is because the unit 87,500 was achieved by dividing the total floor space of the 16 warehouses by 16. The additional 3.53 units resulted from the addition of Warren No. 3 and Big Sale.

Next, the Commission goes to column 4. It heads that column "Total Credited Units". It has a footnote 4 by that heading. At the bottom of the page the footnote is "Based upon 100 square feet per basket ratio." The Special Master has been able to determine no point of application of "100 square feet per basket ratio" to any calculation on either of those two pages of the Commission's re-

port. Therefore; no further comment will be made on that footnote.

What the Commission actually does to produce its column No. 4 is to take the total floor space of each operating group and apply to that the Commission-originated factors for new entrants, namely 100% for the first unit of 87,500 square feet, 75% for the second unit of that size, 50% for the third unit of that size and 25% for the fourth unit of that size or a fraction thereof.

For example, the first operating unit is the Danville Warehouse Company. There are four warehouses in that unit and total floor space is 296,452 square feet. On the basis of 87,500 per unit that produces 3.39 units as shown in column 3 of the Federal Trade Commission's computation.

When the Commission's allocation factors are applied to that 3.39 units there is produced for column 4 a reduced allocation factor of 2.34. So it is clear that the purpose and the result of the modification as shown in column 4 of the Federal Trade Commission's calculation is to reduce substantially the number of units to be counted on the market. The total of the units produced in column 4 is as stated in the Commission's supplemental report—15.24. By the application of the Commission's reducing formula the number of units is reduced from 19.53 (the total of column 3) to 15.24 (the total of column 4). That artificial and unprecedented formula and computation results in reducing the actual units by 22%. That reduction accomplishes two results. First, it redistributes materially the allocation of baskets among the existing warehouses in Danville and, second, it increases the value of the unit which will be acquired by a new warehouse of a new entrant of 87,500 square feet by approximately 25%. In other words, the Commission's modification is a complete redistribution among old warehousemen and a bonus to a new entrant.

Let us look at what would happen under the Commission's modification as to redistribution among old warehousemen.

The present basket allotment per day of the Danville Warehouse Company under the Court decree of June 16, 1962, is 1603. The current allotment under this decree of Bryant-Buckner Associates is 724. Under the Commission's formula as shown in column 4, pages 5 and 6, the total basket allotment per day for the Danville Warehouse Company would be reduced to 1351 baskets, a reduction of 252 baskets from its present allotment. Bryant-Buckner Associates total basket allotment per day would be increased from 724 baskets to 976, or a net gain of 252 baskets which is the identical number of baskets which the Danville Warehouse Company would be reduced. Thus it appears to the Special Master that this would be grossly inequitable.

Going to page 7 of the Federal Trade Commission's Supplemental Report which assumes a New Entrant on the market, the Danville Warehouse Company would have a total basket allotment per day of 1268 baskets, Bryant-Buckner Associates a daily allotment of 916 baskets, whereas a New Entrant would have a daily allotment of 542 baskets. The Danville Warehouse Company would have one basket allotted per 234 square feet of floor space, Bryant-Buckner Associates would have one basket allotted per 184 square feet of floor space, whereas the New Entrant would have one basket allotted per 161 square feet of floor space. The Special Master comes to the inescapable conclusion that such a redistribution among old warehousemen and such a bonus to a New Entrant does not serve the cause of equity and would result in chaos on the market.

The basis alleged by the Federal Trade Commission as the reason for its modification is to, as it says, distribute the burden of over-building equally on old warehousemen and new warehousemen. It is the opinion of the Special Master that the burden of over-building has already been distributed, and painfully so, to the existing warehouses. It is obvious that from year to year as additional building has occurred on a market there has been a painful process of ad-

justment. With respect to the past, the warehousemen have adjusted their differences with reasonable satisfaction. The objective of the Danville Plan has been, not to go back into past history and attempt to make a new distribution among old warehousemen, but to take the situation as it finds it among the old warehousemen and make reasonable provision for a new entrant. As the present problem is understood by the Special Master it concerns only what is reasonably fair to a new entrant on the Danville market or to new construction on the Danville market.

It seems obvious to the Special Master that a completely fair starting point for a new entrant with an average warehouse is a unit equal to the average warehouse on the Danville market. This illustrates the point—if every old warehouse on the Danville market was precisely equal to the average, that is, 87,500 square feet and if a new entrant comes in and builds a new warehouse of precisely 87,500 square feet his unit would be on a parity with the average unit and if he should get a full unit allocation of selling time (omitting at present any consideration of diminution for newness) he could have no possible complaint. Then how can the new entrant be concerned with the fact that the old warehouses are not of the same size? The Special Master has not yet heard any convincing statement or argument to indicate any reason why the taking of the average floor space of the existing warehouses can be unfair to a new entrant. Any adjustment because of departure of an old warehouse from the average size is a matter of concern only to the old warehousmen.

The Special Master can see several great objections to the application of the modification proposed by the Federal Trade Commission.

In the first place, and most important, there is a very practical compelling objection. The warehouses at Danville and throughout the Bright Belt have made adjustment from year to year and have produced allocations under which they are operating reasonably harmoniously and successfully. Any attempt to drastically and retroactively adjust selling time among existing warehousemen would be provocative of controversy and litigation among all of the old warehousemen which would be devastating and might be destructive to the auction warehouse system. Such an adjustment would be dangerously provocative. It is uncalled for.

A second reason why the Federal Trade Commission's modification is unwise is that it is impossible of equitable enforcement in fact. It is impossible at the present time to adjust equities in Danville or in any other market under conditions as existed when any new building occurred.

Let us take the first operating firm as an example. The Danville Warehouse Company has four warehouses, having a total of 296,453 square feet of floor space. The Danville Warehouse Company is one of the oldest operators on the market and at this time has approximately the same number of square feet of floor space as it had certainly as far back as 1943. It is certain that the Danville Warehouse Company has not contributed to the overbuilding of the Danville market. It is certain that in 1943 the Danville market was not over-built. Therefore, real equity would not be achieved by diminishing the units of the Danville Warehouse Company from 3.39 to 2.34. There would be a gross inequity in such diminution because as we have said the Danville Warehouse Company has not contributed anything to the over-building of the Danville market. That is merely an example of the problems which would arise in a practical application of the rigid formula in column 4 of the Federal Trade Commission's report.

Another example is an instance of the leasing of warehouses or the merger of warehouse operations. It is in the record that in the Townes Lea group there are three warehouses at least one of which was leased and another merged. The point that is made here is different from the Danville Warehouse Company dilemma. In an equitable readjustment ac-

cording to conditions as they existed originally, each of those Townes Lea warehouses should be considered as an independent unit entitled to the 100 per cent recognition of floor space as a first unit.

Let us look now at the Neal's group, composed of Neals Warehouse and Growers Warehouse. Originally they were independently operated warehouses. Originally each acquired its floor space as an independent operator. Therefore, it would be argued convincingly for that group that, in retroactively readjusting selling time, Neals and Growers Warehouses should be considered as independently operated just as they were at the time when they were built and acquired original selling time.

The problems which would be presented should column 4 readjustment now be forced stagger the imagination.

Again, it is pointed out that column 4 is an impractical and unprecedented departure from everything that has been said and done since the year 1949 in connection with new entrants on any flue-cured market.

It is the firm and strong opinion of the Special Master that the adoption of the Federal Trade Commission's modification shown on column 4 of its tabulations in its Supplemental Report would, as a practical matter, cause chaos in the warehouse business, would certainly injure it severely, and probably would damage it beyond repair. As the Special Master has pointed out in the first section of this report the growers of tobacco would be injured to the extent of many millions of dollars each year. If the auction warehouse business should be destroyed or seriously damaged and if growers should be remanded to reliance only on government support price the growers would be irreparably damaged. It is the opinion of the Special Master that there is an overpowering public interest against the adoption of the Federal Trade Commission's modifications as suggested in its Supplemental Report.

## THE RIGHTFULNESS OF A REASON-ABLE DIMINUTION OF A NEWCOMER

Here there is a sharp departure by the Federal Trade Commission from what the District Court held and what the Circuit Court said.

Starting from the conclusion that the granting of an average unit of selling time to a new warehouse of a size equal to the average warehouse on the market would give to the newcomer complete equality with the average warehouse on the market, the District Court and the Court of Appeals upheld "the rightfulness of a diminution of a newcomer". (The quotation is from the opinion of the Court of Appeals).

The Danville Plan contemplated a diminution of 25% for a newcomer with the opportunity to improve that 75% by as much as 8% per year based on the newcomer's experience in acquiring customers and selling tobacco. The Danville Tobacco Association thought that reasonable. The District Court held that reasonable. The Court of Appeals appears to have held that reasonable.

The Federal Trade Commission has taken a position which is in complete contradiction of the District Court and the Appeals Court when it said that any diminution at all is improper.

The Special Master does not purport to comment on the legality of a reasonable diminution. He must, he thinks, accept the decision of the District Court and of the Court of Appeals unless and until those decisions are reversed by those Courts.

Then, it appears that the only matter for comment by the Special Master is whether 25% is, on the record of this case, unreasonably large. It would seem that good will, going concern value, established relationships with hundreds of customers are of real value. Certainly everything in our economy supports that conclusion. From the knowledge of the Special Master of the tobacco warehouse business it is his firm opinion that now, and for many decades past, the good will

of a particular warehouse is of very great value to that warehouse; that such valuable good will can be acquired only by services pleasing to customers and only over a period of a number of years.

It is the firm opinion of the Special Master that to diminish the newcomer by an amount of 25% is reasonable, particularly in the light of the fact that by satisfactory and efficient and favorable · operation the newcomer has the opportunity to bring his selling time up to the full average for the unit on the market in a period of four years. In other words, it does appear to the Special Master that a newcomer is treated reasonably fairly when he can come up to the level of the average of the old warehousemen within a period of four years. In fact, it would seem that the initial grant of three-quarters of equality and the opportunity to achieve full equality in four years is not only fair but is a very favorable opportunity.

It is the firm opinion of the Special Master that to permit a newcomer to enter the market on a complete parity with the average established warehouse is an invitation for newcomers to come in for the purpose only of acquiring selling time for negotiation and disposition.

It is the firm opinion of the Special Master that to permit a newcomer to enter a market on a complete parity with average established warehouses would have a dangerous tendency to invite to the market those who have no intent to remain on the market as warehousemen or who have no talent to serve the public satisfactorily as warehousemen.

It is recommended that the Danville Plan retain its present provision for diminution of a newcomer.

## THE FEDERAL TRADE COMMISSION LANGUAGE RELATIVE TO 100 SQUARE FEET PER BASKET

On the last page, page 8, of the Supplemental Report of the Federal Trade Commission there occurs this sentence:

"At all times the total warehouse floor space to be counted in the allocation of selling time should not exceed 880,000 square feet."

Comment on this sentence is very difficult because the Special Master cannot determine to his satisfaction what the Federal Trade Commission meant by that sentence.

It is perfectly clear that in every computation made by the Federal Trade Commission relative to the allocation of selling time on the Danville market it gave some effect to every square foot of the 1,800,000 square feet on the market. In every computation which it used in its Supplemental Report it recognized a unit as 87,500 square feet and it gave to each of the approximately 20 units some credit in the allocation of selling time.

If the sentence means what it says, then no consideration would be given at any time to more than 880,000 square feet on the Danville market. The Special Master cannot believe that the Federal Trade Commission meant just that. Such a meaning would be contrary to everything that every court and the Federal Trade Comission have *said* since 1949. Such a meaning would be contrary to what the Federal Trade Commission has *done* throughout its two reports in this case.

It is the firm opinion of the Special Master that the adoption and enforcement of such a meaning would destroy the auction warehouse system in the tobacco Bright Belt.

## RECOMMENDATIONS AND CONCLUSIONS

After serious consideration the Special Master recommends with respect to the Danville Plan and the Federal Trade Commission reports:

1. That the recommendation of the Federal Trade Commission as is shown in its Supplemental Report, pages 5 and thereafter, be not adopted.

2. That the recommendation of the Federal Trade Commission that there be no diminution whatever because of an entrant being a newcomer be not adopted.

3. That the Danville Plan as adopted by the Danville Tobacco Association as approved by the District Court and as approved temporarily and tentatively by the Court of Appeals be approved as a permanent plan.

Respectfully submitted,
F. S. ROYSTER
Special Master

December 1, 1965

After notice to all of the parties, there was a hearing at Danville on January 21, 1966, on the subjects of the Federal Trade Commission Reports and Recommendations, the Special Master's Reports and Recommendations, and the action to be taken by this Court. All of the parties and persons desiring to be heard were heard at that time and place.

After study and consideration of the record in this case and the arguments of Counsel the Court makes the following Findings of Fact and Conclusions of Law, in addition to the Findings of Fact and Conclusions of Law heretofore made.

## FINDINGS OF FACT

1. The Special Master, Fred S. Royster, is an expert in the field of the operation of tobacco warehouses and the allocation of selling time on the flue-cured tobacco markets.

2. The facts as stated in the First and Second Reports of the Special Master are true and correct.

3. In most major respects the views of the Special Master, relative to the selling time problems of the Danville market, and the views of the Federal Trade Commission are in accord.

4. The determination of 87,500 square feet (the size of the average warehouse on the Danville market at the beginning of this controversy) as the requisite size of a basic and initial unit in the allocation of selling time to a newcomer to the Danville market is fair and equitable.

5. The recommendation of the Federal Trade Commission, as disclosed by its tables on page 5, 6 and 7 of its Supplemental Report, that the units of credit attributable to the old warehouses (as a starting basis for initial division of selling time with a newcomer or newcomers) should be reduced below the number of warehouses from which the average size was obtained (by division of total floor space by the number of warehouses) is unsound, unfair and unreasonable, as is demonstrated in the Second Report of the Special Master.

6. The recommendations of the Federal Trade Commission that a newcomer with a warehouse of average size should receive full average selling time without any diminution for newness and lack of accumulated patronage and good-will is unsound, unfair and unreasonable, as is demonstrated in the Second Report of the Special Master.

7. It is fair, reasonable and equitable to apply to a newcomer some reasonable diminution from the full average initial selling time credit where, as is the case here, there is provided a reasonable opportunity to the newcomer to improve his situation each year by favorable experience.

8. The diminution to a newcomer of 25% from full average initial selling time credit is reasonable and fair.

9. The regulatory provision for gain and loss credits for market experience each year and the limitation of gain or loss to each warehouseman to not more than 8% each year is reasonable and fair.

10. The regulations recommended by Special Master Royster in his First Report, and adopted by the Danville Tobacco Association, and approved by the District Court in its prior proceeding in this case, and approved "pro tempore" by the Court of Appeals, and governing the operations of the Danville Tobacco market throughout the marketing years 1962, 1963, 1964 and 1965, and recommended again by the Special Master in his Second Report, are reasonable, fair and equitable.

## CONCLUSIONS OF LAW

1. The subject matter herein presented in this cause of action is a proper matter for Declaratory Judgment.

2. A regulation requiring the readjustment of all existing selling time allocations among the existing operating warehouse firms on the Danville market in accordance with so-called "total credited units" appearing on pages 5, 6 and 7 of the Supplemental Report of the Federal Trade Commission and the allocation of selling time to a new entrant in accordance with the table on page 7 of the Supplemental Report of the Federal Trade Commission would be unreasonably unfair to the existing warehousemen as between themselves and a new entrant and would be unfair, discriminatory and illegal and unsupported by the record in this case.

3. The recommendations in the Supplemental Report of the Federal Trade Commission that a new entrant to the Danville market be allotted full average selling time for its first average size unit, and that no diminution be made because of newness and lack of accumulated patronage and good will is unfair to the operators who have built the Danville market over a period of more than fifty years into the largest market in the world for Old Belt type of flue-cured tobacco and who, over a period of many years, have acquired good will and established patronage which are of great value to them and to the market. A failure to make a reasonable diminution to a newcomer from the average unit credit for selling time would be unfairly discriminatory against the established operators and would be improper and contrary to law.

4. It is not unfair, inequitable or illegal, and it is fair, equitable and legal, to establish as a unit for computing selling time for a new entrant on the Danville market, the figure of 87,500 square feet, the average size of the warehouse on the Danville market at the time of the origin of this controversy and the basis of the regulations adopted by the Danville Tobacco Association now in effect.

5. It is not unfair or improper or illegal, but it is fair and proper and legal, to diminish by a reasonable amount of percentage the selling time to be allocated to a new entrant for a first unit selling time below the average selling time for such unit, provided there is afforded by the regulations an opportunity to the new entrant to increase his selling time from year to year by experience.

6. Diminution to a new entrant of 25% from the average selling time for a first basic unit is not unreasonable or unfair or illegal where there are, as in this case, regulations which permit gain and loss based on experience and limited to not more than 8% of any of the selling time of any warehouse in any year.

7. The limit of gain or loss because of experience in any year to 8% is not unfair, discriminatory or illegal.

8. The regulations recommended by Special Master Royster in his First Report, and adopted by the Danville Tobacco Association, and approved by the District Court in its prior proceeding in this case, and approved "pro tempore" by the Court of Appeals, and governing the operations of the Danville Tobacco market throughout the marketing years 1962, 1963, 1964 and 1965, and recommended again by the Special Master in his Second Report, are not unreasonable or illegal and they do present a careful, proper, practical and legal method of allocating selling time; and said regulations are approved again by this Court in their entirety for the operation of the Danville market for the tobacco season 1966–67; and for operating years thereafter until such regulations may be changed by proper action of the Danville Tobacco Association or its successor, or by proper order of a Court having jurisdiction over the matter.

It is now, therefore, ordered, adjudged and declared

That the Court declares as its Declaratory Judgement that the allocation of selling time and the handling of selling time as recommended in the First and Second Reports of the Special Master and as heretofore adopted by the Danville Tobacco Association and as now in effect constitute a proper and legal manner of allocating selling time both as to the

warehousemen now on the Danville market and as to a new entrant who may present himself thereafter; and that said regulations are not illegal or improper and are not unreasonably discriminatory and do constitute proper and legal method of allocating such selling time for the tobacco season of 1966–67 and for future seasons thereafter and until they may be changed in whole or in part by proper action of the Danville Tobacco Association or its successor, or by proper decree of a Court with jurisdiction over the matter.